**David Poe WOOD, Plaintiff–Appellant,**

v.

**Vernon G. HOUSEWRIGHT, George Sumner, Defendants–Appellees.**

No. 87–2519.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 6, 1989.

Decided April 2, 1990.

Jerome I. Braun, Douglas R. Young, Jennifer Schwartz, Farella, Braun & Martel, San Francisco, Cal., for plaintiff-appellant.

Brian McKay, Atty. Gen., Waldo DeCastroverde, Deputy Atty. Gen., State of Nevada, Carson City, Nev., for defendants-appellees.

Before HUG, FARRIS and REINHARDT, Circuit Judges.

FARRIS, Circuit Judge:

David Poe Wood, an inmate at the Nevada State Prison sued Vernon Housewright, then Director of the Nevada State Department of Prisons, and George Sumner, Warden of the Nevada State Prison, in the United States District Court for the District of Nevada seeking damages and injunctive relief under 42 U.S.C. § 1983. Wood alleged that the defendants were liable for: 1) deliberate indifference by the prison staff to his medical needs, and 2) for denying him meaningful access to the courts in his effort to pursue this action. The district court ruled in favor of the defendants. We affirm.

## FACTS

### I. Medical Treatment

In early January, two months before he was admitted to the Nevada State Prison, Wood injured his shoulder in a jailhouse fight. A Las Vegas physician repaired the damage by inserting two pins in Wood's shoulder. He also prescribed a sling to immobilize Wood's arm and to prevent the pins from coming dislodged.

On March 11, 1983, the Nevada State Prison admitted Wood as a new inmate. Ignoring Wood's protests, the prison guard admitting Wood confiscated the sling because 1) he believed it to be a security threat and 2) he did not have access to Wood's medical file to prove its medical necessity. Sometime in the next few days Wood broke one of the pins in his shoulder and began to experience pain.

Wood immediately complained of his injury and saw the prison physician several days later. The doctor prescribed an anti-inflammatory and pain-killing medication and recommended Wood be referred to an outside orthopedic specialist. No further

action was taken, because Wood's medical records were still not at the prison.

On March 30, 1983 Wood was moved back to Las Vegas for hearings in his criminal conviction. He returned to the prison on April 14, 1983 and that same day he complained to prison authorities about the pain in his shoulder. Two days later Wood wrote a letter to Warden Sumner and Vernon Housewright, requesting assistance in expediting medical treatment. On April 22, 1983 Wood saw the prison physician again. The doctor took additional x-rays, prescribed more medication and again referred Wood to an outside orthopedic specialist. Wood signed a medical release form at that time. Finally, on May 4, 1983, Wood saw the orthopedic specialist, who removed the floating pin.

## II. Access to the Courts

In 1984 Wood started working on bringing this lawsuit pro se. At that time he was incarcerated in the administrative segregation unit of the prison and so had limited access to law books. Wood had to rely on inmate law clerks, who had only limited education and training, to obtain requested law books from the prison library. Until September 1985 when the prison library system was upgraded, the law clerks had little formal training. This system of inmate law clerks was supplemented by monthly visits of the library supervisor to each unit. Wood did successfully use this system to conduct legal research. In March 1986 satellite law libraries were put in the segregation units, but the library in Wood's unit was located in a supply cabinet to which he had only limited access.

On October 22, 1984 Wood wrote letters to Sumner and Housewright complaining about his inability to obtain legal help. Wood subsequently made numerous other protests to Sumner, Housewright and other prison officials regarding the lack of legal assistance. Sumner responded to Wood's complaints and directed his assistants to ensure that Wood received proper legal assistance. Wood continued to complain about his difficulty in conducting research until the eve of his trial.

## ANALYSIS

### I. The Eighth Amendment Claim

■ An inmate's complaint of inadequate medical care amounts to a constitutional violation if the inmate alleges "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Toussaint v. McCarthy*, 801 F.2d 1080, 1111 (9th Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). In determining deliberate indifference, we scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect. *Toussaint*, 801 F.2d at 1111. Prison officials are deliberately indifferent to a prisoner's serious medical needs when they "deny, delay or intentionally interfere with medical treatment." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir.1988). We agree with the district court that, while the prison official's treatment of Wood may have been negligent, it did not rise to the level of deliberate indifference.

■ Wood's strongest claim is that the prison officials failed to provide the inmate's medical records when he arrived at Nevada State Prison. This failure caused the confiscation of Wood's sling, which in turn caused the harm Wood complains of. This conduct, though apparently inexcusable, does not amount to deliberate indifference. While poor medical treatment will at a certain point rise to the level of constitutional violation, mere malpractice, or even gross negligence, does not suffice. Although Wood's treatment was not as prompt or efficient as a free citizen might hope to receive, Wood was given medical care at the prison that addressed his needs. *Cf. Ortiz v. City of Imperial*, 884 F.2d 1312 (9th Cir.1989) (deliberate indifference found where police knew of prisoner's condition and totally failed to treat it competently).

■ Nor does the delay in treatment that Wood suffered constitute an eighth amendment violation; the delay must have caused substantial harm. *See Shapley v. Nevada Bd. of State Prison Com'rs*, 766 F.2d 404, 407 (9th Cir.1985). Given the seriousness of his condition and the treatment Wood actually received such harm was not present here. Wood's condition did not require emergency attention. *Cf. Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir.1980) (delay of six days in treating hepatitis may constitute deliberate indifference). Nor did the delay substantially harm Wood's treatment, considering that the only remedy immediately available was a prescription for painkillers. *Cf. Hunt v. Dental Department*, 865 F.2d 198, 199 (9th Cir.1989) (three month delay in replacing dentures, causing gum disease and possibly weight loss constituted eighth amendment violation).

## II. The Sixth Amendment Claim

■ *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977), established the right of inmates to "meaningful" access to the courts through "adequate law libraries or adequate assistance from persons trained in law." In determining whether this constitutional minimum has been breached, we "focus on whether the individual plaintiff before [us] has been denied meaningful access." *King v. Atiyeh*, 814 F.2d 565, 568 (9th Cir.1987) (citation omitted).

Our prior decisions support the district court's finding that the system of satellite law libraries and inmate law clerks provided to Wood was constitutionally adequate. The system at the Nevada State Prison is very similar to the one we found constitutional in *Lindquist v. Idaho State Bd. of Corrs.*, 776 F.2d 851 at 854 (9th Cir.1985) (library supplemented by inmate law clerks provides meaningful access to the courts). Although Wood's access to the library was limited because of his special conditions of confinement, we have held that prison officials may regulate the use of the library to ensure the security of the facility. *Id.* at 858.

Wood himself admitted that he could and did get the books and supplies he needed to complete basic research, and that he received assistance from other inmates in preparing his legal materials. Wood's success was naturally limited due to his lack of a legal education, but "[t]his circuit's decisions have reflected our belief that the Constitution requires that certain minimum standards be met; it does not require the maximum or even the optimal level of access.... [T]he Constitution does not require the elimination of all economic, intellectual, and technological barriers to litigation." *Sands v. Lewis*, 886 F.2d 1166, 1169 (9th Cir.1989).

■ Where inmates can not show denial of adequate law libraries or adequate assistance from persons trained in the law, they may still succeed by showing "actual injury" to court access. *Id.* at 1192 (confiscation of carbon paper and typewriter did not constitute actual injury). Again, Wood's claim fails. Wood has not shown that defendants or their charges interfered in his efforts to bring this case. The only allegation of this type is that on one occasion prison guards took a book from Wood's cell and returned it to the library so other inmates could use it. This action certainly did not constitute actual injury to Wood's pursuit of his legal claim. The district court's findings that Wood was not prejudiced in his efforts to seek redress for his legal claims is supported by the record.

## III. Right to Counsel Claim

■ 28 U.S.C. § 1915(d) provides that the district court may appoint counsel for indigent civil litigants. The district court refused to appoint counsel for Wood. That decision was not an abuse of discretion.

Counsel should only be appointed in exceptional circumstances, based on such factors as the likelihood of success on the merits and the ability of the plaintiff to articulate his claims in light of their complexity. *Wilborn v. Escalderon*, 789 F.2d 1328 at 1331 (9th Cir.1986). The instances that Wood claims indicate the presence of these factors are difficulties which any liti-

gant would have in proceeding pro se; they do not indicate exceptional factors.

AFFIRMED.

HUG, Circuit Judge, concurring:

I write separately in affirming the judgment of the district court because I differ with Judge Farris' analysis of the Eighth Amendment claim. I conclude that the confiscation of the sling and the long and unjustified delay in treatment to remove the broken pin did amount to deliberate indifference as discussed in Judge Reinhardt's dissent. However, I agree to affirm because I find an insufficient basis to impose personal liability on Housewright, as the Director of the Nevada State Department of Prisons, or Sumner, as the Warden of the Nevada State Prison.

The findings of the district court indicate that there was no personal involvement in, or knowledge of, the confiscation of the sling or the delay in treatment. Sumner testified that it was against the prison policy to confiscate medically necessary equipment. The dissent contends that the failure to establish more exact guidelines to implement that policy was deliberate indifference on the part of Sumner and Housewright. More explicit guidelines may well have prevented this unfortunate exercise of judgment on the part of the guard, but I cannot categorize the lack of more explicit guidelines as rising to the level of an Eighth Amendment violation within the meaning of *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Similarly, it may be desirable to have more definitive regulations concerning the acquisition of medical records so as to avoid possible delay in treatment involved. However, I cannot conclude that Housewright and Sumner were personally deliberately indifferent to the medical needs of Wood simply because they failed to have anticipated this delay problem and adopted more definitive regulations for procuring medical records more quickly.

I concur in the remainder of Judge Farris' opinion and thus concur in affirming the judgment.

REINHARDT, Circuit Judge, Dissenting in part:

I agree that Wood failed to prove his claims under the sixth amendment at trial, and also that the district judge did not abuse his discretion in refusing to appoint counsel for him.[1] However, I strongly disagree with Judge Farris's conclusion that Wood suffered no eighth amendment injury. The confiscation of his sling and the inordinate delay in providing essential medical care clearly constituted "deliberate indifference," and his resultant pain and suffering clearly meet the standard set forth in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).[2]

While Judge Hug and I (and thus the panel majority) are in agreement on this fundamental issue, I must respectfully disagree with his conclusion that there is no need for the district court to reconsider its determination that the two individual defendants bear no share of the legal responsibility for the constitutional violation. The district court's holding that neither Housewright nor Sumner was personally responsible for those constitutional violations cannot be sustained because the court improperly analyzed the nature of the defendants' duties under Nevada law, and thus failed to consider the specific acts or omissions which render the defendants liable under section 1983. In my opinion, Nevada law required the defendants to establish poli-

---

1. On the latter point, however, my agreement stems only from the fact that we review the district court's decision for abuse of discretion. At least by the time the district court denied the defendants' motion for summary judgment, the court should have realized that Wood's eighth amendment claim had substantial merit. In view of its importance for many other people affected by the Nevada penal system, that claim deserved better presentation than Wood (who nonetheless performed surprisingly well) was able to give it. Under the circumstances, it would have been preferable to appoint counsel at that stage, if not sooner.

2. The facts found by the district court demonstrate beyond question that Wood's constitutional rights were violated by persons acting under color of state law; its contrary conclusion is plainly in error.

cies and procedures designed to ensure that an inmate's medical records are available shortly after his arrival—policies which, if properly established and followed in this case, would have prevented the constitutional violations alleged and proven by Wood. I would therefore reverse and remand so that the district court could determine in the first instance whether Housewright and Sumner properly discharged their legal responsibilities.

## I. DELIBERATE INDIFFERENCE

By virtue of the eighth and fourteenth amendments to our Constitution, the government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Prison officials violate that obligation when they manifest "deliberate indifference to serious medical needs of prisoners.... This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs *or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.*" *Id.* at 104–05, 97 S.Ct. at 291–92 (emphasis added; footnotes omitted). *See also Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir.1988). Judge Farris is of the view that no constitutional violation occurred. I, like Judge Hug, respectfully disagree. In my opinion, Wood has shown three distinct instances of unconstitutional conduct—three distinct instances of deliberate indifference to his serious medical needs that resulted in pain and suffering cognizable under *Estelle.*

### A. Confiscation of the Sling

The prison officials who admitted Wood to the Nevada State Prison ("NSP") on March 11, 1983 intentionally interfered with Wood's medically prescribed treatment when they confiscated his sling. Judge Farris recites this fact and characterizes it as "Wood's strongest claim," but then proceeds to a discussion of medical malpractice. In doing so, I respectfully suggest, he misperceives a principal issue

in the case. Wood's claim is not that the admissions personnel provided inadequate medical treatment when they confiscated the sling; it is rather that in confiscating the sling, they *interfered* with *previously prescribed* medical treatment that was concededly adequate. Professional neglect has nothing to do with this claim.

*Tolbert v. Eyman*, 434 F.2d 625 (9th Cir.1970), cited with approval by the Supreme Court in *Estelle*, 429 U.S. at 105 n. 12, 97 S.Ct. at 291 n. 12, explains the nature of my colleague's error in plain terms. In *Tolbert*, the prisoner alleged that medication prescribed by the prison physicians (but provided from outside the prison at the prisoner's expense) was intercepted by prison authorities four times and returned to the sender for "security reasons." The defendants there also attempted to characterize the claim as one of merely negligent treatment, but the *Tolbert* court noted that the "mere malpractice" argument "completely misses the thrust of Tolbert's complaint, which names as defendant not the doctors, but the warden. The gravamen of his claim is not that he was erroneously diagnosed by the prison doctor, but that the warden refused to allow him authorized medicine that he needed to prevent serious harm to his health." 434 F.2d at 626. *See also Shapley v. Nevada Bd. of Prison Comm'rs*, 766 F.2d 404, 408 (9th Cir.1985); *Campbell v. Beto*, 460 F.2d 765 (5th Cir. 1972) (allegation that prisoner was assigned to work detail more strenuous than his medical classification admitted, held sufficient to state a cause of action under section 1983); *Martinez v. Mancusi*, 443 F.2d 921 (2d Cir.1970) (allegation that guards removed prisoner from public hospital without discharge, forced him to walk and stand after leg surgery, and deprived him of medication, all in violation of the surgeons' orders, held sufficient to state a cause of action under section 1983), *cert. denied*, 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971); *Jones v. Evans*, 544 F.Supp. 769 (N.D.Ga.1982) (confiscation of a medically prescribed back brace might constitute deliberate indifference even where defendants were generally attentive to plaintiff's needs).

In order to find deliberate indifference in the confiscation of the sling, one need not go as far as the *Jones* court did when it opined that a nonmedical employee's *interference* with prescribed care "can almost never be characterized as other than deliberate and indifferent." 544 F.Supp. at 775. Suffice it to say that the burden of justification for interfering with medical treatment must logically be heavier than for failing to provide such treatment in the first instance, for fairly simple reasons. While the crowded conditions and limited resources in most prisons unfortunately result in a standard of care somewhat lower than that which prevails in society at large, it usually requires neither sophisticated facilities nor additional resources to allow a prisoner to continue with a course of treatment he is already receiving. Certainly, in the absence of the practical limitations that are customarily offered to excuse poor health care, nonmedical defendants who take affirmative steps to interfere with treatment that is not only possible, but is actually occurring, must assume a heavy burden of justification.

That burden was not met here. Wood informed the admitting official that his sling was medically necessary. Admissions personnel could not look at Wood's medical records because those records had not been transferred with Wood. The admitting official could have referred Wood to the prison hospital, where a medical examination or X-rays could easily have confirmed the presence of the pins and the concomitant need for the sling; presumably, the official could also have consulted with a prison medical assistant before deciding what to do. However, without the benefit of any medical records, without referring Wood to a prison physician for a determination of his medical needs—in fact, without medical consultation of any kind, the admitting official made a conscious decision to confiscate the sling *whether or not* it was medically

necessary. This behavior was both deliberate and indifferent to Wood's serious medical needs. In addition, Wood claimed that he made several efforts to have the prison authorities return the sling, to no avail. Although the district court made no findings regarding Wood's postconfiscation efforts, the alleged conduct of the authorities in failing to return the sling, without making any inquiries of prison medical personnel, would, of course—for the same reasons—constitute deliberate indifference.

### B. Delay in Medical Treatment

Within a few days after the confiscation of Wood's sling, the pin in Wood's shoulder broke—as might reasonably have been anticipated.[3] Wood promptly notified prison officials that he was in pain and sought medical help, but he was not seen by a physician until March 22, 1983, eleven days after the sling was confiscated and, according to the district court, "anywhere from a week to ten days after his complaints were made known." Dr. McLennan, a physician working at NSP under contract with the State, took X-rays of Wood's shoulder and correctly diagnosed his problem, noting that a piece of the broken pin was "floating" in Wood's shoulder. Dr. McLennan recommended that Wood be seen by Dr. Schnaser, an outside orthopedic specialist. However, Wood was not taken to Dr. Schnaser until May 4, some fifty-four days after the initial confiscation and some forty-three days after Dr. McLennan determined that Wood's condition required treatment by a specialist. Once Wood was taken to Dr. Schnaser, the "floating" pin was surgically removed that same day.

Wood contends that these facts show a delay in treatment so unreasonable as to constitute an instance of deliberate indifference that is distinct from the confiscation of the sling. The defense, however, advanced two possible excuses for the de-

---

**3.** The record does not disclose the exact date of this injury, but the appellees do not dispute Wood's suggestion that it occurred "[s]ometime in the next few days," and the district court found that Wood was in pain "almost immediately" after his arrival at the prison on March 11, 1983. Moreover, Wood also testified that he informed prison officials at the time his sling was confiscated that he had steel pins in his shoulder that would need to be removed before he could move his arm. Thus, Wood made his need for medical attention known to prison officials at the time of his admission to the prison.

lay. First, Dr. McLennan testified that he was unable to treat Wood when he first saw him because Wood's medical records were not in his file. The district court apparently believed the need for medical records excused the delay, noting, "No doubt a newly received prisoner would be subject to a period of processing and settling in before other than emergency or life or health threatening complaints could be attended to." However, this observation fails to account for the delay of nearly eight weeks here. Whatever the maximum reasonable duration of a "period of processing and settling in" may be, it must be substantially fewer than fifty-four days.[4]

The second excuse offered by the defendants is that Wood spent some of the eight-week period outside NSP. The district judge found that on March 30, 1983, Wood was taken from NSP to the Clark County jail for hearings in connection with his criminal conviction, and that he was not returned until April 14, 1983.[5] "Practically," the court asserted, "treatment had to await his return to NSP where he could be seen by Dr. Schnaser."

However, this two-week absence also fails to excuse the delay, for several reasons. As a preliminary matter, it is not at all clear that the absence is relevant, for the State may well have been obligated to treat Wood even before his March 30 removal. That, after all, was nineteen days after his arrival (ample time for "processing and settling in") and eight days after Dr. McLennan's diagnosis. The district judge thought it "fair to say that it might take a week or so for a free citizen to be able to make an appointment and see a family physician ... or to see a specialist such as Dr. Schnaser." I am less confident that a private citizen experiencing pain

from a broken metal shaft in his shoulder would wait a week to have it repaired or removed. Next, it is not at all clear why the NSP authorities could not have arranged for Wood to see an orthopedic specialist—possibly even the surgeon who inserted the pins—during the two weeks he spent at the Clark County jail.[6]

In any event, the more fundamental problem with the tendered excuse is that Wood's physical absence from the prison cannot possibly be thought sufficient reason for the prison authorities to delay *arranging for* Wood's visit to Dr. Schnaser. Even if the State need not have treated Wood prior to March 30, it certainly should have arranged for treatment immediately upon his return. Instead, it waited *another eight days* after his return before sending Wood to Dr. McLennan again, *then* furnished Wood with a form for the release of his medical records, and then waited *twelve more days* before taking Wood to Dr. Schnaser. Surely, even if the State gets "a week or so" to arrange for treatment, it does not get a fresh "week or so" at every step of the way.

Judge Farris offers a different rationale for rejecting Wood's argument. He cites *Shapley v. Nevada Board of State Prison Commissioners*, 766 F.2d 404, 407 (9th Cir. 1985), for the proposition that a delay in treatment is not actionable unless it causes substantial harm. He appears to take the position that Wood's medical needs were not serious enough to give rise to a violation of his rights under the eighth amendment because his injury did not threaten his life or health. However, any such assertion is foreclosed by *Estelle*. There, the Court explicitly stated that the eighth amendment applies not only to cases which

4. Moreover, Wood was not presented with a form for the release of his medical records until April 22, 1983, one full month after his initial examination. The necessity of a "period of processing and settling in," whatever else it may excuse, cannot excuse unreasonable delay in the processing and settling in itself.

5. Wood remained in the custody of the Nevada Department of Prisons, rather than the Clark County authorities, for all but three days of this period.

6. The facts surrounding the initial insertion of the pins when Wood was previously at the jail contrast usefully with the events after his transfer to NSP. It appears from the record that Wood's initial injury occurred on January 3, 1983, and officials at the Clark County jail managed to attend to Wood's needs *completely,* *including the surgery,* within only eleven days.

"actually produce physical 'torture or a lingering death,' [quoting *In re Kemmler*, 136 U.S. 436, 446, 10 S.Ct. 930, 933, 34 L.Ed. 519 (1890) ]," but also to "less serious cases, [in which] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose." *Estelle*, 429 U.S. at 103, 97 S.Ct. at 290. As Dr. Schnaser noted pithily in his testimony, "[I]t hurts to have a pin back out through your skin." This pain, while undoubtedly in *Estelle*'s "less serious" category, was nonetheless substantial enough to constitute a serious medical need.[7] For the same reasons, any assertion that Wood must allege some sort of permanent physical damage is equally untenable.

Moreover, the proposition advanced by Judge Farris is not supported by the authorities he cites. In *Broughton v. Cutter Laboratories*, 622 F.2d 458 (9th Cir.1980), we held that a six-day delay in the treatment of hepatitis, during which time the inmate was in the prison hospital, might constitute deliberate indifference; surely the fifty-four day delay in the treatment of Wood's shoulder caused more pain and showed less concern by prison officials. In *Hunt v. Dental Dep't*, 865 F.2d 198 (9th Cir.1989), an inmate who had lost his dentures in a prison riot alleged that prison officials waited three months before placing him on a soft-food diet, during which time his teeth were breaking and his gums were bleeding. We held that his allegations were sufficient to state a claim under section 1983. *Hunt* involved less pain and only slightly more delay than Wood suffered. Certainly, neither *Hunt* nor *Broughton* supports a requirement of lasting injury or a threat to life or health.

In summary, Wood notified prison authorities of his condition on March 11, 1983 when he was admitted. On March 22, they themselves belatedly concluded that he was in need of medical treatment. Once the authorities were aware of Wood's serious medical needs, their foot-dragging response to those needs, evidenced by the delay of nearly eight weeks between complaint and treatment, cannot be characterized as anything other than deliberate and wilful indifference.

## C. Failure to Obtain Medical Records

The two constitutional violations already discussed point to a third. Wood contends that his medical records should have been transferred on March 11, 1983, at the time he was transferred from the Clark County jail to NSP; or that, at the least, the records should have been transferred shortly thereafter. I agree, and conclude that this, too, constituted deliberate indifference.

The State apparently chooses not to provide medical treatment to prisoners without reviewing their medical records, and at least in nonemergency situations, there may well be merit to that course of action. It seems prudent for doctors to review new patients' medical histories before prescribing treatment whenever possible. However, given this requirement, the State has an obligation to facilitate the obtaining of prisoners' medical records, whether by ensuring that prisoners arrive with their medical records or by making whatever other arrangements can reasonably be made, so that the records will be available at the institution when the prisoners arrive or as soon thereafter as practicable. For, whatever prerequisites the State attaches to the availability of medical care, the State's constitutional obligation to provide that care remains undiminished. Inmates are certain to have medical complaints; that is why the State provides doctors and infirmaries in the first place. The failure to request the medical records of prisoners transferring to a new institution until *after* they need medical attention virtually ensures that medical care will be delayed when the inevitable need for such care

---

7. *See also Wood v. Sunn*, 865 F.2d 982 (9th Cir.1988) (involving a different Wood). There, the prison doctors diagnosed the plaintiff's complaints as psychosomatic, and determined that the best way to deal with the complaints was to ignore them. Although the record sustained the contention that the diagnosis was at least partially correct, the court affirmed a finding of deliberate indifference, noting, "Whether or not Wood's pain was physically based, it was real." 865 F.2d at 989 (footnote omitted).

finally arises. When such failure reflects the common practice, the system contains a built-in period of needless suffering, evidencing deliberate indifference on the part of the State to the health of the inmates and to their future medical needs.

At oral argument, the Deputy Attorney General argued that it would be unreasonable to expect the State to transfer a prisoner's records from the jail along with the prisoner, although he failed to explain why. I do not believe that we can simply assume the correctness of his argument. In any event, even if the State could establish a valid reason for not transferring medical records along with its prisoners, that proposition would not advance its cause much. For the State completely failed to explain why it makes no effort to obtain medical records as soon after a prisoner's arrival as practicable.[8] Here, necessary medical treatment was unreasonably delayed because there was apparently no procedure for obtaining records until *after* the need for them arose. By making its receipt of medical records a prerequisite to constitutionally required medical care (or perhaps simply by assuming absolute custody over persons who may suffer illness or injury), the State assumed the obligation to make at least a reasonable effort to obtain those records at the earliest practicable time. The failure to make *any* effort to procure Wood's records until after he suffered a serious injury constituted a third instance of deliberate indifference.[9]

## II. LIABILITY OF THE DEFENDANTS

Of course, Wood must show more than a violation of his constitutional rights; to prevail under section 1983 he must show that Housewright and Sumner are persons who, under color of state law, subjected him, or caused him to be subjected, to the deprivation of those rights. 42 U.S.C. § 1983. After concluding that Wood had not proven any constitutional violations, the district court held as an alternative ground for its judgment that neither Housewright nor Sumner could be charged with liability even if there were a constitutional violation.

The district court arrived at this alternative ground after considering two possible theories of liability under section 1983:

The liability of Mr. Housewright and Mr. Sumner must be found in their actual participation in the deprivation of the constitutional rights of plaintiff or their encouragement of such deprivation. At a minimum plaintiff must show that these officials directly or implicitly authorized, approved, or knowingly aquiesced in the alleged unconstitutional conduct. *Buckner v. State of Nevada*, 599 F.Supp. 788, 791 (D.Nev.1984); *see Hoptowit v. Ray*, 682 F.2d 1237, 1252–54 (9th Cir.1982); *Hirst v. Gertzen*, 676 F.2d 1252, 1263 n. 28 (9th Cir.1982). One other possible basis for liability of the defendants must be pursued and that is whether there is any specific statute of Nevada or regulation of the State Prison Board or [Nevada Department of Prisons] which would impose a duty upon either of them, the violation of which could result in liability.

The district judge rejected the first theory of liability because he found no credible evidence to support the allegation that either Housewright or Sumner knew about Wood's medical problems prior to May 4, 1983, when Wood's medical needs were finally met.[10] The court rejected the second

---

**8.** I note that if the State fails to obtain the records, even through no fault of its own, it may be required in some instances to provide the needed medical care without the benefit of those records. I do not need to reach the question here whether the failure to provide medical treatment notwithstanding the absence of medical records constituted deliberate indifference in Wood's case.

**9.** This violation, because of its causal relation to the other two, resulted in substantial harm to

Wood. It is therefore not necessary to consider whether the policy pursued by the State could successfully be challenged by an inmate who had not yet required any medical assistance at the prison.

**10.** Although other conclusions might have been drawn from the record, the court's limited *factual* finding is not clearly erroneous. Wood testified that he wrote letters to Director Housewright and Warden Sumner on April 16, 1983. After reviewing the letter, Sumner (whose testi-

theory because it found that the state statutes imposing affirmative duties upon Housewright and Sumner do not, in the court's words, "make [them] absolutely liable for everything that happens in the prison respecting the health of inmates."

On both points, the district court's legal analysis was incorrect. We have summarized the possible bases of liability under section 1983 as follows:

> A person "subjects" another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, *or omits to perform an act which he is legally required to do* that causes the deprivation of which complaint is made.... Moreover, *personal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable.* The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

*Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir.1978) (emphasis added). Under this standard, the district court's analysis was deficient in a number of respects, at least some of which require reversal. I need mention only two critical deficiencies.

First, the court's statement of the law was erroneous. Personal liability under section 1983 need not be based upon authorization, approval, or acquiescence; it is sufficient if the defendant "omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." 588 F.2d at 743. Knowledge of Wood's medical needs, while possibly relevant to the question of whether the defendants authorized, approved, or acquiesced in the deliberate indifference to

those needs, has no bearing on whether the defendants failed to perform an act they were legally required to perform, or whether that failure caused Wood's injury, either directly or indirectly. Thus, the finding that neither Housewright nor Sumner knew about Wood's medical needs was not sufficient to insulate them from liability.

Second, although the court appears to have realized that liability could rest upon a breach of duties imposed by state law, the court failed to give sufficiently concrete content to the broad duties which Nevada law imposes upon Housewright and Sumner. The district judge mentioned only the abstract policy of "provid[ing] care for inmates equivalent, so far as possible, to that provided for free citizens in the outside world." He failed to identify the specific acts required of the defendants in order to fulfill their broad, general obligations under the pertinent Nevada statutes. In short, the court failed to consider whether the *specific* measures taken by the two officials were adequate or whether by failing to adopt certain policies or procedures they violated their statutory obligations.

With the proper legal standards in mind, I find two ways in which Housewright and Sumner may well have been liable for Wood's constitutional injuries. I discuss each in turn.

### A. Failure to Establish Policy Regarding the Obtaining of Medical Records

Wood contends that Director Housewright and Warden Sumner were ultimately responsible for the transfer of his medical records. If Wood seeks to hold Housewright and Sumner liable for *every* failure to obtain records, then his theory goes too far. Nonetheless, it is clear that, at a minimum, Nevada law makes the two officials responsible for establishing policies or procedures designed to ensure that the

---

mony preceded Wood's) stated that he did not recall receiving it, and the trial judge instructed Wood that he would need to lay a foundation in some other way before the letter could be admitted. Although Wood did lay a suitable foun-

dation later through his own testimony, he never again offered the letter into evidence. Housewright never testified because, apparently, he lived outside the state of Nevada and could not be subpoenaed.

medical records of prisoners are obtained promptly.

Section 209.131 of the Nevada Revised Statutes imposes a number of affirmative obligations upon the Director of the Department of Prisons that are pertinent here. The Director is to "[r]eceive ... in accordance with law offenders sentenced to imprisonment in the state prison;" to "[b]e responsible for the supervision, custody, treatment, care, security and discipline of all offenders under his jurisdiction;" to "[e]stablish regulations ... and enforce all laws governing the ... custody, care and training of offenders;" and to *"[t]ake proper measures to protect the health and safety of ... offenders* in the institutions and facilities of the department." Nev.Rev.Stat. § 209.131(3)–(6) (1987) (emphasis added). To facilitate the discharge of these important obligations, the Director is to appoint a warden for each institution. "Each warden is responsible to the director for the administration of his institution, including the execution of all policies and the enforcement of all regulations of the department pertaining to the custody, care and training of offenders under his jurisdiction." Nev.Rev.Stat. § 209.161(3) (1987) (emphasis added). Moreover, Nevada Department of Prisons Administrative Regulation 600(V)(C)(3), cited by the district court, charges the warden of each institution with "ultimate responsibility for the welfare of the inmates in the institution and for *insuring that the inmates have the level of health services commensurate with contemporary medical practice"* (emphasis added).

These general statutory duties encompass the specific duty to establish policies and procedures by which inmates' medical records are obtained upon transfer or promptly thereafter. Given the fact that inmates may not be treated at NSP without their medical records, and the fact that treatment can in any event best be prescribed if records are available for review, Sumner could "insur[e]" that the inmates have the level of health services commensurate with contemporary medical practice," *id.,* only by taking reasonable steps to see that medical records are generally obtained at the earliest practicable date. Similarly, Housewright could scarcely be thought to have taken "proper measures to protect the health and safety of ... offenders in the institutions and facilities of the department," Nev.Rev.Stat. § 209.131(6), unless he established policies or procedures designed to ensure that the medical record prerequisite for care and treatment would generally be satisfied. Hence, these statutes leave little doubt that the State delegated constitutional duties regarding the obtaining of medical records to Housewright and Sumner.

This obviously does not amount to making the warden or the director "absolutely liable for everything that happens in the prison in respect to the health of an inmate," as the district court apparently feared. For example, Housewright and Sumner could hardly have been blamed here if Dr. McLennan, after looking at Wood's medical records, had negligently failed to arrange for removal of the broken pin. Likewise, if Wood's records had been promptly requested pursuant to a constitutionally adequate procedure, but the records had been lost by the Las Vegas physician who inserted the pins, there would be no basis for a finding that Housewright or Sumner had breached the duties delegated to them by the Nevada legislature. Similarly, if the institution in possession of the records refused to forward them to the prison, the prison officials could not be held liable. But Wood's argument here is that Housewright and Sumner established *no* policies or procedures for obtaining medical records in a timely fashion, and that the two officials were therefore in breach of their duties. This does not make the defendants absolutely liable for all record errors; it only makes them responsible for establishing and administering *policies* designed to safeguard constitutional rights. If they fail to fulfill this responsibility and their failure causes injuries to others, either directly or by "setting in motion a series of acts by others," *Johnson,* 588 F.2d at 743, then they are liable to those injured.

It is still necessary to ask whether Housewright and Sumner properly discharged their obligations. The district court concluded that "[t]here was nothing deficient in the 'measures' or policies of the director," and that "[n]either NRS 209.161 nor NDOP AR 600(V)(C)(3) is a source of liability on the part of Warden Sumner in this case." However, it appears from the court's order that the district judge failed to base his conclusions on any policies more specific than the prison's broad policy of "endeavor[ing] to provide care for inmates equivalent, so far as possible, to that provided for free citizens in the outside world." That broad policy is laudable, of course, but it cannot be thought sufficient to cut off any more searching eighth amendment analysis. To determine the liability of Housewright and Sumner in this case, the court should have examined the procedures by which the NSP officials sought to ensure the general availability of medical records. If no such procedures were in place, or if the procedures in place made it foreseeable that new inmates such as Wood would be subjected to indefinite periods of suffering while their records were belatedly obtained, then Housewright and Sumner violated their duties under State law. If so, then their "omi[ssion] to perform an act which [they were] legally required to do," *Johnson*, 588 F.2d at 743, which omission caused the harm sustained by Wood, makes them liable under section 1983.

The record strongly suggests that there were in fact no policies or procedures governing the obtaining of prisoners' medical records in advance of the onset of a prisoner's injury or suffering. Wood's contention that he was not presented with a release form until April 22, 1983 is unrefuted in the record, and there is likewise no dispute concerning the fact that Wood's records had not been obtained at that time. If it had been standard procedure for an inmate's medical records to be transferred

with the inmate, or shortly thereafter, then it is curious that neither the prison official who admitted Wood on March 11, nor the medical staff at any time prior to April 22, took any steps to correct that deficiency. The obvious inference is that the absence of Wood's medical records was standard operating procedure.[11] If so—and there is nothing in the record to suggest the contrary—then the standard operating procedure is constitutionally unacceptable, and Housewright and Sumner should be held liable under section 1983 for deliberate indifference to Wood's serious medical needs.

However, although the evidence clearly suggests the defendants' liability, it is for the district court to evaluate the relevant testimony in the first instance. Therefore, I believe that the proper disposition on appeal would be to reverse and remand for further proceedings. For the record, I would have encouraged the district judge to reopen the proceedings and allow the parties to adduce additional testimony on, among other things, the general procedures, if any, by which medical records are obtained at NSP; in fact, for the reasons noted below, I would have suggested that the district judge consider granting a new trial.

Judge Reed did a commendable job of accommodating a *pro se* plaintiff; he properly attempted to assist Wood in the complex task of developing the evidence necessary to substantiate his claims; and I have nothing but praise for the way Judge Reed balanced his concern for orderly proceedings with his desire that the truth be reached. Nonetheless, there appears to be a strong possibility that Wood's questioning was unduly influenced by the judge's failure to appreciate the nature of Housewright's and Sumner's responsibilities under Nevada law, and that as a result, the record may not have been properly developed.[12] Moreover, both the record and var-

---

**11.** This inference is further supported by the defendants' assertion at oral argument that we would be unreasonable to expect the transfer of records along with the prisoners.

**12.** On one occasion, Wood awkwardly attempted to discover something about general procedures by asking how they had been changed since the events in question. Without waiting for objection, Judge Reed asked, "How is that relevant here? What we're looking for is you,

ious statements of the defendants' counsel suggest that constitutionally inadequate procedures may be in place even now at NSP, and perhaps elsewhere in the Nevada prison system. That is a possibility that should not be dismissed without further inquiry.

### B. Failure to Establish Policy Regarding the Confiscation of Medical Supplies and Equipment

The absence of medical records was not the sole cause of Wood's injuries; the confiscation of his sling was also a substantial, and indeed seminal, cause of his subsequent pain and suffering. Wood contends that Housewright and Sumner must also bear responsibility for this instance of deliberate indifference. For many of the same reasons as those expressed above, I agree.

As explained earlier, official interference with prescribed medical treatment, in the absence of strong justification, constitutes deliberate indifference. It would make little sense to hold that sections 209.131 and 209.161 impose a duty to facilitate medical treatment while holding at the same time that those sections impose no duty to proscribe official interference with such treatment. Since there is every reason to expect that some prisoners will arrive at the prison with canes, crutches, slings, or medications, it seems evident that some policies and procedures regulating the possession and use of those items are necessary. Any such policies and procedures, of course, must ensure that prisoners are not wrongfully deprived of necessary medical supplies or equipment upon their arrival. For the reasons explained earlier, Housewright and Sumner were responsible for establishing and enforcing such policies and proce-

dures. The failure to discharge this responsibility, where it leads to constitutional injury as it did here, is sufficient to support liability under section 1983.

The question again becomes whether Housewright and Sumner properly discharged their duty. Again, I believe the evidence suggests that they did not. Officer Christy testified that confiscation was left to the discretion of the "sergeant or whoever was in charge that day." Furthermore, Sumner testified, in response to questioning by Wood, that there were "no procedures" governing the confiscation of medically necessary equipment when inmates were received into the prison. *Cf.* Nev.Rev.Stat. § 209.131(3) (requiring the Director to "receive [offenders] according to law"). Although Sumner also testified that it was against NSP policy to confiscate medically necessary equipment, nothing in the record contradicted Officer Christy's testimony that the determination of medical necessity was left not to medical personnel, but rather to the "sergeant or whoever was in charge that day." Nothing in the record suggests that this person was required, encouraged, or even permitted to refer inmates with claims of medical necessity to trained medical personnel. Again, the district court made no findings on this issue because the court simply failed to recognize or identify the specific duties comprised by the broad language of sections 209.131 and 209.161. This essentially factual issue is one for the district court to determine, at least in the first instance.

If Housewright's and Sumner's general policies regarding admission, by their silence or otherwise, permitted nonmedical personnel to confiscate medical equipment without obtaining any medical advice, then I submit that Housewright and Sumner

did you have access to the courts, was there deliberate indifference to your serious medical needs. So I'm going to rule out that question. Try to be specific about your situation, what happened so far, whether changes that affected you, if you can inquire from that standpoint.... [S]pecifically one of the focus periods is March to May of 1983, so zero in on what you want to zero in on with [Sumner]." While Wood's question certainly did raise valid relevancy concerns under rule 407 of the Federal Rules of Evidence,

Judge Reed's admonition could not have been expected to alert Wood to the fact that his question was improper only because it concerned *subsequent remedial measures,* and that questions regarding general procedures were not only relevant, but critical. Indeed, on his next question Wood abandoned the topic of general procedures altogether and limited his inquiry to facts specifically concerning him: whether or not Sumner received a letter from him on March 22, 1983.

must bear full responsibility for the entirely foreseeable confiscations that were virtually certain to occur. When those confiscations rise to the level of deliberate indifference, as did the one at issue here, then Housewright and Sumner must be held liable for their omissions under section 1983. However, for the same reasons as those I expressed in Part II.A, *supra,* I would remand to the district court for an initial determination of the constitutional soundness of admission procedures at NSP.