986 F.2d 1424
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Andrew GOOSBY, Plaintiff-Appellant,
v.
Barbara WHITMORE, et al. Defendants-Appellees.
 No. 91-2773.
 
 Seventh Circuit.
 Submitted Jan. 28, 1993.*
Decided Feb. 11, 1993.
 Before CUMMINGS, CUDAHY and MANION, Circuit Judges.
 
 ORDER
 
 1
 Andrew Goosby, a Wisconsin inmate, brought this civil rights action alleging that the defendants gave him inadequate medical care in violation of the Eighth Amendment. The district judge gave summary judgment for the defendants, and Goosby appealed. After reviewing the record and the parties' briefs, we agree that there was no "deliberate indifference" to Goosby's shoulder and elbow problems, Wilson v. Seiter, 111 S.Ct. 2321 (1991); McGill v. Duckworth, 944 F.2d 344 (7th Cir.1991) (rejecting the objective standard of recklessness contained in Benson v. Cady, 761 F.2d 335 (7th Cir.1985)), and therefore AFFIRM the district judge's decision for the reasons stated in the attached Opinion and Order.**
 
 ATTACHMENT
 IN THE UNITED STATES DISTRICT COURT
 FOR THE WESTERN DISTRICT OF WISCONSIN
 
 2
 Andrew Goosby, Plaintiff,
 
 
 3
 v.
 
 
 4
 Barbara J. Whitmore, Cindy Hilt, Dr. Robert Becker, and Dr.
 
 
 5
 Armond Start, Defendants.
 
 OPINION and ORDER
 90-C-605-C
 May 30, 1991
 
 6
 This is a civil action for declaratory and monetary damages brought pursuant to 42 U.S.C. § 1983, in which plaintiff contends that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by exhibiting deliberate indifference to the injuries in his arm and shoulder.[1] Defendants have moved for summary judgment, contending that they provided plaintiff with constitutionally adequate medical attention.
 
 
 7
 I conclude from the undisputed facts that defendants were not deliberately indifferent to plaintiff's medical condition, and that judgment should be entered in their favor.
 
 
 8
 To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When the moving party succeeds in showing the absence of a genuine issue as to any material fact, the opposing party must set forth specific facts showing that there is a genuine issue for trial. Also, if a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the opposing party is proper.
 
 
 9
 From the proposed findings of fact and exhibits, and for the sole purpose of deciding the motion for summary judgment, I find there is no genuine issue as to the following facts.
 
 UNDISPUTED FACTS
 
 10
 At all times relevant to this action, plaintiff Andrew Goosby was incarcerated at the Waupun Correctional Institution in Waupun, Wisconsin. Defendant Barbara J. Whitmore was the director of the state bureau of Correctional Health Services and defendant Armond Start was the medical director for the bureau. Defendant Whitmore's responsibilities include developing and implementing policies for the delivery of health services, preparing budgets, directing staff and reviewing inmate complaints regarding the provision of health services at the correctional institutions. Defendant Cindy Hilt was the Health Services Unit manager at Waupun Correctional Institution. Defendant Robert Becker was the staff physician at Waupun Correctional Institution from September 1, 1989 until May 1990.
 
 
 11
 In the summer of 1988, plaintiff told Dr. Leenhouts, a physician at Waupun Correctional Institution, that for approximately three months he had noticed a mass in his left shoulder, and that approximately one year earlier he began noticing that the muscles of his left hand were slowly atrophying. Plaintiff was referred to the neurology department at the University of Wisconsin Hospital and Clinics.
 
 
 12
 On September 15, 1988, plaintiff underwent certain tests on his arm and shoulder. A magnetic resonance imaging test (MRI) of plaintiff's left shoulder showed moderate glenohumeral joint effusion (moderate increase in shoulder joint fluid). No mass in the shoulder was identified. The EMG (electromyogram) and NCV's (nerve conduction studies) conducted to assess the atrophy of plaintiff's hand showed evidence of left ulnar neuropathy (nerve dysfunction in the ulnar nerve). On September 27, 1988, plaintiff was seen by Dr. Schutta at the University of Wisconsin Hospital and Clinics, who found no evidence that plaintiff suffered from an acute neurological problem and recommended that plaintiff be seen by Dr. Engber, a hand surgeon at the University of Wisconsin, for possible surgical treatment.
 
 
 13
 On December 22, 1988, plaintiff was seen by Dr. Engber, who diagnosed plaintiff as having severe degenerative joint disease of the left shoulder and ulnar neuropathy at the left elbow, which related to the atrophy of plaintiff's hand. The recommended treatment was "limited activity of the left shoulder to tolerance," and that plaintiff return to the clinic in four to six months. Plaintiff's condition was classified as "Non-Surgical." During his visit with Dr. Engber, plaintiff understood Engber to recommend that he undergo surgery for his elbow and hand as soon as possible. However, this recommendation is not reflected in the Off-site Service Request and Report form prepared at the university by a resident physician whose signature is not legible.
 
 
 14
 In December 1988, plaintiff began experiencing chest pains, and throughout the month of December was seen and treated by medical personnel at Waupun Correctional Institution on at least nine occasions. In January 1989, after a catheterization procedure showed an occlusion of plaintiff's right coronary artery, plaintiff underwent a percutaneous transluminal coronary angioplasty procedure, and was discharged subsequently from the university hospital in stable condition.
 
 
 15
 In May 1989, plaintiff was again referred to Dr. Engber. The Off-site Service Request and Report indicates that plaintiff was diagnosed as having degenerative joint disease of the left shoulder and ulnar neuropathy. The notation in the section titled "recommended procedure" reads "EMG/NCV's Left shoulder." Dr. Engber wrote a report following his consultation with plaintiff, in which he restated his previous diagnoses of degenerative joint disease and severe ulnar neuropathy with denervation of the musculature of the hand. Engber noted that plaintiff had some pain but could use his hand for everything, including handball; that plaintiff had a decreased range of motion in his left shoulder and marked wasting of the musculature of the hand; that Engber had told plaintiff the only option for treating plaintiff's shoulder was arthrodesis (fixation), which would have greatly reduced plaintiff's use of the shoulder; and that plaintiff had expressed a desire to retain the use of his shoulder for as long as possible. Therefore, Engber did not recommend shoulder arthrodesis, but he did recommend "repeat EMG and NCV's segmented across the elbow" in response to plaintiff's reports of increasing motor loss in his left hand. Engber did not set a date for these repeat tests but stated he would see plaintiff again after they had been completed.
 
 
 16
 On May 16, 1989, defendant Hilt sent defendant Start a Request for Authorization for Class III Surgery form asking for EMG/NCV's for plaintiff's left shoulder, based on her understanding that the requested tests consisted of EMG/NCV's of plaintiff's left shoulder, instead of repeat EMG and NCV's across the elbow. Dr. Start's responsibilities include reviewing requests for non-routine and non-emergency medical procedures, and determining whether the requested procedures are medically appropriate and necessary. He received Hilt's Class III request on May 22, 1989.
 
 
 17
 Correspondence between Start and the health services units at various correctional institutions is routed routinely through the office of defendant Whitmore to ensure that she is aware of requests for non-routine medical procedures involving inmates and the classifications of such requests. All correspondence sent to defendant Whitmore that is directed to or intended for the medical director is forwarded to Dr. Start for appropriate action.
 
 
 18
 Class III conditions are those that do not present a significant threat to the patient's general medical health and are not likely to pose such a threat in the foreseeable future. Class III is divided into A and B. Class III-A conditions are defined as those involving persistent pain and serious discomfort or rapidly progressive disease or impairment, or where the severity of pain has been progressive. The condition must be subject to surgical or medical correction or arrest. Class III-B conditions do not involve persistent pain or impairment, rapidly progressive disease or impairment. They are those in which no medical effects will result from surgical delay of months or years.
 
 
 19
 The request defendant Start received from defendant Hilt on May 22, 1989 stated that plaintiff had been diagnosed as having "DJD left shoulder" (degenerative joint disease) and ulnar neuropathy at the left elbow. No explanation was given for the purpose of the requested tests. On May 24, 1989, Start sent a memo to the health services staff at Waupun Correctional Institution requesting additional information about plaintiff's degree of disability and what they expected the requested tests to show.
 
 
 20
 Defendant Hilt received Start's memo on May 30, 1989, and sent the request for more information to the physician's desk at Waupun Correctional Institution for further attention on June 1, 1989. On June 7, 1989, Dr. Leenhouts ordered plaintiff's medical chart pulled. No further action is reflected in plaintiff's medical records until late August 1989. At that time, defendant Becker was working as a part-time staff physician at Waupun Correctional Institution. He became aware of plaintiff's condition when he made rounds in temporary lockup, and heard plaintiff's complaints about his left arm problem. Dr. Becker noted from a review of plaintiff's medical records and a visual examination that plaintiff showed signs of carpal tunnel syndrome, atrophy of the muscles in the area between the thumb and index finger of the left hand, and ulnar neuropathy in the left arm.
 
 
 21
 On the basis of his review, defendant Becker wrote in response to defendant Start's May 24, 1989 memo that EMG and NCV tests had been performed on plaintiff, and that plaintiff's left shoulder probably did not require testing at this time. He stated that plaintiff had had atrophy of the left thumb muscles since 1987, and that he was scheduling a follow-up consultation with neurology. Becker did not intend to indicate by his response to Dr. Start that plaintiff did not need any tests performed on his arm.
 
 
 22
 On September 5, 1989, defendant Becker directed defendant Hilt to send Becker's response to Dr. Start, attaching copies of a radiologist report on plaintiff's left shoulder, the EMG/NCV report from September 1988, and Dr. Schutta's consultation report. On or about the same date, Becker directed the scheduling of an orthopedic consultation for plaintiff at the University of Wisconsin. The appointment was made for November 16. On September 7, 1989, Dr. Start received defendant Becker's response. From Becker's handwritten notes, Start understood that relevant testing had been done, that matters had been taken care of, and that a decision by him on the Class III request was no longer necessary.
 
 
 23
 On November 15, 1989, defendant Hilt received a call from the University of Wisconsin orthopedic clinic canceling plaintiff's November 16, 1989 appointment because the requested repeat EMG/NCV's had not yet been performed. On November 16, 1989, defendant Becker saw plaintiff in the Health Services unit. Plaintiff complained of pain in his left forearm. Plaintiff refused medication for the pain, but was still receiving aspirin for his 1989 heart catheterization. Plaintiff informed defendant Becker that he had not been to the university clinic on that day as scheduled. Becker was not yet aware of the reason for the canceled appointment. He ordered that another appointment be scheduled for plaintiff as soon as possible.
 
 
 24
 On November 17, 1989, defendant Hilt made a late notation of her November 15 phone call with the university orthopedic clinic. Also on November 17, she resubmitted a request for the relevant tests to defendant Start, and attached a copy of Start's May 24 memo with the notes added previously by Becker.
 
 
 25
 On November 21, 1989 defendant Start received defendant Hilt's November 17 request. This request noted again that the tests had already been done on September 15, 1988, and that defendant Becker had made another orthopedic appointment for plaintiff. Again, Start believed that no action was required on his part.
 
 
 26
 On November 21, 1989, defendant Becker saw the November 17 entry and became aware that retests were necessary before plaintiff could be seen at the university clinic. Becker ordered defendant Hilt to resubmit to Start the Class III request with an attached copy of Dr. Engber's May 11, 1989 request for repeat tests on plaintiff's elbow. Defendant Hilt submitted this request on November 29, 1989.
 
 
 27
 On December 4, 1989, defendant Start received the request for authorization for Class III surgery for plaintiff submitted by defendant Hilt on November 29, 1989. This request contained a notation to Start indicating that the orthopedic consultant wished to have the repeat EMG/NCV testing done before the next clinical appointment. Based on this data, Start classified the request as III-B, and directed that no elective procedures should be scheduled at the present time. He requested that the staff at Waupun Correctional Institution resubmit the request for evaluation in six months.
 
 
 28
 At the time he made this decision, Start believed from the information presented that plaintiff's condition was basically stable, and that although the atrophy of his hand should be monitored and corrected if possible, there was no obvious medical procedure available that would ensure that the condition would be corrected. In his medical judgment, defendant Start believed a conservative therapeutic response was warranted in order to obtain a later assessment of plaintiff's condition and the possible benefits of surgical or other intrusive treatment. In reaching this conclusion, Start took into account that plaintiff had already received tests for his shoulder and hand; that there was no recommendation for surgery at present; that plaintiff had expressed unwillingness to undergo a surgical procedure on his shoulder; and that he had been hospitalized recently for a heart condition.
 
 
 29
 On December 12, 1989, Waupun Correctional Institution received defendant Start's response classifying the request for plaintiff as III-B. On December 13, 1989 defendant Hilt notified plaintiff of Start's classification of the Class III request, but referred to the tests as involving his right shoulder.
 
 
 30
 Plaintiff's medical records indicate that on March 28, 1990, plaintiff complained of left ulnar palsy and wanted to know why surgery had not yet been scheduled. Dr. Dasgupta, who was filling in for defendant Becker, advised plaintiff to write to defendant Start.
 
 
 31
 Upon returning to work in the beginning of April 1990, defendant Becker read plaintiff's record. On April 3, 1990, Becker spoke to Dr. Engber at the university hospital regarding plaintiff's questions about surgery for his left hand. Engber advised Becker he would not see plaintiff until the EMG/NCV's were done. Engber also told Becker that to the extent plaintiff's neuropathy was the result of neural compression, the condition might still be reversible after 1-2 years. Defendant Becker noted on plaintiff's chart that he wanted the whole staff to meet and discuss the case.
 
 
 32
 On April 5, 1990, plaintiff expressed concern to defendant Becker about the delay of his case. On April 9, 1990, at Becker's direction, defendant Hilt sent Start another Class III request for EMG/NCV tests, with an added notation that Dr. Engber did not believe that plaintiff's ulnar neuropathy was necessarily stable and that it might respond to surgical decompression.
 
 
 33
 The April 9, 1990 request for authorization of EMG/NCV tests indicated to Start that the tests were at the request of Engber; that Engber would use these studies to determine whether plaintiff's condition was worsening; and that it might be possible to correct plaintiff's ulnar neuropathy by surgical decompression. Based on this information, Start classified the request as III-A, and instructed the institution to make arrangements for the tests. The health services unit at Waupun Correctional Institution scheduled plaintiff's tests for May 2, 1990, and the tests were performed on that date at the university hospital.
 
 
 34
 On May 22 and June 26, 1990, defendant Hilt requested plaintiff's tests results. She received them on July 11, 1990. On August 17, 1990, she scheduled plaintiff for a follow-up appointment with Engber. On September 27, 1990, plaintiff saw Engber, who recommended decompression surgery for plaintiff's left ulnar nerve if the surgery was cleared by plaintiff's cardiologist.
 
 
 35
 On October 1, 1990, at the direction of staff physician Dr. Mehmet Akture, defendant Hilt submitted a Class III request for surgery for decompression of plaintiff's left ulnar nerve based on Engber's recommendations following plaintiff's September 27, 1990 appointment.
 
 
 36
 On October 12, 1990, defendant Start received the request for authorization of Class III surgery. Prior to this request, no surgical procedures had been recommended for plaintiff's ulnar nerve problem. Based on the information provided by Engber, Start approved surgery for plaintiff's left ulnar nerve on October 16, 1990, classifying the procedure as III-A.
 
 
 37
 On November 26, 1990 plaintiff was cleared by the physicians at the university hospital cardiology section for surgery. He underwent surgery on December 31, 1990.
 
 
 38
 Plaintiff's condition is now stable. He has received all recommended medical treatments.
 
 
 39
 In her capacity as director of the Correctional Health Services bureau, defendant Whitmore's only involvement with plaintiff was in responding to his letters and reviewing his inmate complaints. Defendant Whitmore has the authority to accept or reject an inmate complaint investigator's recommendation for the disposition of an inmate complaint.
 
 
 40
 Beginning in September 1989, plaintiff submitted numerous complaints regarding his medical care at Waupun Correctional Institution. From the facts in the examiner's reports, it was defendant Whitmore's opinion that plaintiff's medical problems were being addressed adequately by the medical personnel concerned. On September 12, 1989, in response to inmate complaint 1655-89, in which plaintiff complained about a lack of treatment for his arm, defendant Whitmore accepted the recommendation of the inmate complaint examiner but suggested that the examiner tell the plaintiff to discuss the matter with defendant Becker, and that the medical staff submit another Class III request, because it appeared from her review of the complaint that there had been some delay in having the authorization request submitted and evaluated.
 
 
 41
 In December 1989, defendant Whitmore received a letter from plaintiff regarding his inmate complaints and a request for medical records. She responded in March 12, 1990, and advised plaintiff of his appeal rights, and of his rights to copies of his medical records.
 
 OPINION
 
 42
 Plaintiff's main contention is that for nearly three years defendants failed to give proper attention to his medical condition. The parties agree that this case is governed solely by the Eighth Amendment, which confers on states an obligation to provide medical care to those whom it has incarcerated. Estelle v. Gamble, 429 U.S. 97, 103-04 (1976); Wellman v. Faulkner, 715 F.2d 269, 271 (7th Cir.1983), cert. denied, 468 U.S. 1217 (1984).
 
 
 43
 In Estelle, the Supreme Court held that a plaintiff can establish an Eighth Amendment violation if he can prove that he has been the victim of "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." 429 U.S. at 106. In addition, a plaintiff must show actual harm as a result of the indifference. Id., 429 U.S. at 106; Thomas v. Pate, 493 F.2d 151, 158 (7th Cir.1974), cert. denied sub. nom., Thomas v. Cannon, 419 U.S. 879 (1974). Deliberate indifference in the denial or delay of medical care is evidenced by a defendant's actual intent, or reckless disregard. Reckless disregard, in turn, is characterized by highly unreasonable conduct or a gross departure from ordinary care in a situation in which a high degree of danger is readily apparent. Benson v. Cady, 761 F.2d 335, 339 (7th Cir.1985).
 
 
 44
 The Eighth Amendment is not implicated by conduct amounting merely to an inadvertent error, Whitley v. Albers, 475 U.S. 312, 319 (1986), or treatment that would constitute ordinary malpractice or negligence. See Benson v. Cady, 761 F.2d at 339 (citing Estate of Davis v. Johnson, 745 F.2d 1066, 1070 (7th Cir.1984)); Kelley v. McGinnis, 899 F.2d 612, 616 (7th Cir.1990).
 
 
 45
 Plaintiff argues first that defendants violated the Eighth Amendment by failing to arrange for surgery when it was recommended for his ulnar neuropathy. See Estelle, 4298 U.S. at 104-05; Kelley v. McGinnis, 899 F.2d 612 (prison officials may be deliberately indifferent to inmates' serious medical needs when they deny, delay, or intentionally interfere with needed medical treatment). Plaintiff's argument rests on his belief that Dr. Engber recommended in September 1988 that plaintiff have such surgery as soon as possible. However, the undisputed facts show that defendants were unaware at that time of any recommendation from plaintiff's treating physician for immediate surgery, or even that surgery was a possible therapeutic option.[2] The record reflects that it was not until April 1989 when defendant Becker became aware that surgery was an option for plaintiff that any of the defendants can be charged with knowing of this recommendation. There is no factual basis for plaintiff's claim of intentional delay or denial of necessary medical treatment.
 
 
 46
 Plaintiff's second argument is that defendants were deliberately indifferent to his condition by delaying unreasonably his access to evaluations and tests that led eventually to his corrective surgery. Such delay could manifest deliberate indifference or willful neglect. In Wellman v. Faulkner, 715 F.2d 269, for example, the Court of Appeals for the Seventh Circuit held that deliberate indifference could be inferred from allegations that two inmates had complained about their medical needs for two years without receiving any treatment at all, and that a third with an abscessed buttock was seen only once in five years, and then by a physician's assistant. In Duncan v. Duckworth, 644 F.2d 653 (7th Cir.1981), the court found deliberate indifference on the part of a hospital administrator when the plaintiff was told repeatedly that he was being scheduled for surgery for his fractured wrist but the surgery was not performed for 22 months. Id. at 654. In Johnson v. Bowers, 884 F.2d 1053, 1056 (8th Cir.1989), the Court of Appeals for the Eighth Circuit found deliberate indifference from a delay of nine years during which the defendants failed to heed a doctor's specific recommendations that the plaintiff receive surgery, placing plaintiff at risk of permanent harm. In these cases, the plaintiffs' allegations showed evidence of excessive and unreasonable delays in treatment. However, even a brief postponement in treating a serious injury can violate the Eighth Amendment if it is the product of deliberate indifference. See Brown v. Hughes, 894 F.2d 1533 (11th Cir.1990) (deliberate indifference inferable where prison guard ignored plaintiff's broken foot for hours without explanation).
 
 
 47
 However, the mere fact of delay does not amount to an Eighth Amendment violation unless the delay can be attributed to defendants' willful neglect or reckless disregard. See, e.g, Benson v. Cady, 761 F.2d at 341 (where defendants failed to ensure that plaintiff received prescribed medication and cervical collar, and defendant prescribed psychiatric drug incorrectly instead of pain reliever, causing adverse side effects, plaintiff's allegations stated possible claims of negligence but no Eighth Amendment claims, absent allegations of deliberate interference or knowledge of harm); Shockley v. Jones, 823 F.2d 1068, 1072 (7th Cir.1987) (despite injury to plaintiff, mere delay in providing him with therapeutic equipment did not state Eighth Amendment claim); Colbeth v. Civiletti, 516 F.Supp. 73, 82-83 (N.D.Ind.1981) (no Eighth Amendment violation where surgery was not required and record reflected continued monitoring of plaintiff's condition); Wood v. Housewright, 900 F.2d 1332, 1334-35 (9th Cir.1990) (claim of only poor or negligent treatment where prison's failure to provide plaintiff's medical records resulted in confiscation of his shoulder sling, which loosened his shoulder pins, and a three-month delay in treatment).
 
 
 48
 In this case, the undisputed facts do not permit the drawing of an inference that defendants exhibited any deliberate indifference or reckless disregard in the treatment they provided to plaintiff. Plaintiff's condition was monitored continually, particularly by Dr. Becker. Although plaintiff did not receive surgery as promptly as he desired, he did not wait months for medical attention, as did the plaintiffs in Wellman and Johnson. The record reveals no deliberate or reckless failure to schedule necessary surgery, as in Duncan. Once defendants Becker, Hilt and Start were aware of the possibility that surgery could correct plaintiff's condition, all three acted promptly to arrange for the necessary tests and surgery.
 
 
 49
 Plaintiff did experience a significant delay, or series of delays, in receiving approval from Dr. Start for the repeat EMG/NCV tests that were a necessary prelude to the follow-up appointment with Dr. Engber. A close inspection of the facts reveals that although some of the defendants may have made some errors in judgment that contributed to the delay, none acted with the deliberate indifference necessary to establish a violation of plaintiff's constitutional rights.
 
 
 50
 When defendant Hilt first submitted a request to Dr. Start for the repeat tests recommended by Dr. Engber, she described the procedure incorrectly as "EMG/NCV's of the left shoulder," which was also the procedure recommended on the off-site service request and report form for plaintiff's visit to the hospital. Plaintiff has adduced no facts to suggest that Hilt intentionally misstated the nature of the recommended tests.
 
 
 51
 After Dr. Start returned the request on May 22, 1989, defendant Hilt sent the request for more information to the physicians' desk for a doctor to address. Dr. Leenhouts ordered plaintiff's chart pulled, but there is no evidence that any medical personnel acted on plaintiff's test request until Dr. Becker assumed responsibility for plaintiff's case in August 1989. This delay raises questions, but it does not permit the drawing of any inference that any of the defendants treated plaintiff with callous disregard during this period. Soon after his arrival at Waupun Correctional Institution, Dr. Becker became aware of plaintiff's condition and reinstituted proceedings to obtain authorization for plaintiff's repeat tests.
 
 
 52
 Plaintiff's case was subject to another delay when Dr. Becker first responded to Dr. Start's May 24 memo without making it clear that plaintiff needed tests on his elbow, so that Start believed he was being asked to approve tests that had already been performed. Although this communication did not have the desired result for plaintiff, it is not possible to infer from the facts that either defendant Start or Becker acted with deliberate indifference to, or callous disregard for, plaintiff's condition.
 
 
 53
 When defendant Hilt submitted another request for testing on November 29, 1989, at Dr. Becker's request, she attached a copy of Dr. Engber's recommendation for Dr. Start to review. Again, Start did not approve the request, because no specific surgical procedure to correct plaintiff's condition had been recommended, and the tests were merely diagnostic.
 
 
 54
 The facts reveal that there may have been errors in judgment: Hilt's and Becker's initial communications to Dr. Start were somewhat misleading or confusing, and did not explain the desired procedure fully. Dr. Start could have delved more deeply into the information provided to ascertain why he was being asked repeatedly to authorize a procedure if it had already been performed. It might have been prudent for Dr. Becker to have contacted Dr. Engber to clarify the situation. However, none of these actions or misperceptions suggest deliberate indifference or callous disregard on the part of defendants Becker, Hilt and Start. See Benson v. Cady, 761 F.2d at 340 (inadvertent failure to provide adequate medical attention, or negligence in diagnosing or treating a medical condition does not rise to the level of an Eighth Amendment violation) (citing Estelle at 105); Wood, 900 F.2d at 1334 (isolated instances of neglect do not establish deliberate indifference).
 
 
 55
 With respect to defendant Whitmore, I can find nothing in the record that would permit the drawing of an inference that this defendant displayed any deliberate indifference to plaintiff's condition either in her reviews of his inmate complaints or in the communications between the Health Services Unit and Dr. Start concerning plaintiff's tests.
 
 
 56
 Last, plaintiff argues that even if each defendant's conduct does not rise to the level of deliberate indifference, such indifference is evidenced by the repeated, long-term, negligent care rendered by defendants collectively. This argument is not supported by the facts. The only actions that might be deemed departures from reasonable care are the following: defendant Hilt's initial request to Dr. Start; Dr. Becker's response to Start's memo of May 24; and Dr. Start's second conclusion that plaintiff's tests had been perofrmed and that no more tests were warranted at that time.
 
 
 57
 Even if these actions were negligent, they do not form a pattern of conduct evidencing the requisite deliberate indifference on the part of any one defendant. See Kelly v. McGinnis, 899 F.2d at 617 (discussing implicit holding of Benson v. Cady, 761 F.2d 335, that plaintiff's allegations stated separate claims of negligence but no pattern evidencing deliberate indifference on the part of authorities). The isolated errors in judgment by defendants Hilt, Becker and Start do not suggest any official deliberate indifference to the delivery of health care at the institution generally. With respect to defendant Whitmore, it is not possible to infer from the delays in authorizing tests and surgery in this case that she had developed or maintained a system she knew or should have known would not address plaintiff's need to receive needed tests and surgery. Cf. DeGidio v. Pung, 920 F.2d 525, 532-33 (8th Cir.1990) (prison officials' consistently negligent responses to tuberculosis outbreak disregarded known or obvious risks to inmate population, manifesting deliberate indifference to method of providing health care).
 
 ORDER
 
 58
 IT IS ORDERED that defendants' motion for summary judgment is GRANTED.
 
 BY THE COURT:
 
 59
 /s/ Barbara B. Crabb
 
 BARBARAB B. CRABB
 District Judge
 
 
 *
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Circuit Rule 34(f). Goosby has filed such a statement and requested oral argument. Upon consideration of that statement, the briefs, and the record, the request for oral argument is denied and the appeal is submitted on the briefs and record
 
 
 **
 We did not consider Goosby's exhibits. This material was not properly before the district judge, and Goosby never moved to supplement the record on appeal under Fed.R.App.P. 10
 
 
 [1]
 Plaintiff also sought injunctive relief in the form of surgery. Because plaintiff has received surgery since the filing of his complaint, his request for injunctive relief is moot
 
 
 [2]
 In his brief, plaintiff suggests that defendants altered his medical records and refused to provide him with the required tests and surgery for economic reasons, presumably to keep prison costs down. However, plaintiff does not provide any competent evidence to support this theory