Lance Conway WOOD, Plaintiff,

v.

IDAHO DEPARTMENT OF CORRECTIONS, et al., Defendants.

No. CV04–99–C–BLW.

United States District Court, D. Idaho.

March 30, 2005.

R. Bruce Owens, Owens James Vernon & Weeks, Coeur d'Alene, ID, for Plaintiff.

Keely E. Duke, Hall Farley Oberrecht & Blanton, Michelle R. Points, Hawley Troxell Ennis & Hawley, Richard H. Greener, Jon T. Simmons, Greener Banducci Shoemaker P.A., Boise, ID, John O. Fitzgerald, II, Moffatt Thomas Barrett Rock & Fields, Chtd., Steven K. Tolman, Tolman Law Office, Twin Falls, ID, for Defendants.

## ORDER

WINMILL, Chief Judge.

Pending before the Court are Defendant Lundgren's Motion for Summary Judgment (Docket No. 56), Defendant Antonie's Motion for Summary Judgment (Docket No. 91), Idaho Department of Correction (IDOC) Defendants' Motion for Summary Judgment (Docket No. 96), Plaintiff's Motion for Summary Judgment (Docket No. 99), Prison Health Services, Inc., (PHS) Defendants' Motion to Strike Declarations (Docket No. 114), PHS Defendants' Motion for Summary Judgment (Docket No. 126), Plaintiff's Motion for 56(f) Postponement (Docket No. 133), and Plaintiff's Motion to

Compel (Docket No. 136). The Court has determined that oral argument is unnecessary. Having reviewed the record in this case, and having considered the arguments of the parties, the Court enters the following Order.

## I.

### MOTION TO STRIKE

PHS Defendants move the Court to strike the declarations of three inmates (Docket No. 114). The Declarations of Mr. Ward, Mr. Carlin, and Mr. Hansloven (Docket Nos. 107, 108, and 109) will be stricken because they are irrelevant and without foundation. They address unrelated medical care of these inmates, and there is no expert testimony provided to support the conclusions that their medical care was inappropriate.

## II.

### SUMMARY OF PLAINTIFF'S CAUSES OF ACTION

The following[1] is a summary of Plaintiff's causes of action in this case:

Count I(A) Eighth Amendment violation, deliberate indifference to Plaintiff's serious medical needs for iritis care against Phil Foster, Eric MacEachern, Dan Allen, Kent Shriver, Lawanda Thomason, Ken Aldren, Alis Lahie, Sandra Dee Martin, Debi Titus, Dr. Hill, Dr. Lundgren, Dr. Antonie, Susan Whipple, and PHS, Inc.

Count I(B) Eighth Amendment violation, deliberate indifference to Plaintiff's serious medical needs for delay in providing Hepatitis A and B vaccinations against Phil Foster, Eric MacEachern, Dan Allen, Kent Shriver, Lawanda

1. Plaintiff has agreed to voluntarily dismiss all claims against Defendants Dr. Baillie and Mr. McCready from this action. Therefore, no reference is made to those defendants in this summary.

Thomason, Ken Aldren, Alis Lahie, Sandra Dee Martin, Debi Titus, Dr. Hill, Dr. Lundgren, Dr. Antonie, Susan Whipple, and PHS, Inc.

Count II — Eighth Amendment violation, sexual abuse and harassment, against Sandra Dee Martin.[2]

Count III — Fourth Amendment right to privacy violations, repeated body searches and sexual harassment, against Sandra Dee Martin.

Count IV — Eighth Amendment violation, informing staff that Plaintiff was stalking her, against Sandra Dee Martin.

Count V — Eighth Amendment violation, failure to protect him from sexual abuse and harassment of Sandra Dee Martin by failure to take necessary disciplinary actions against her, against Tom Beauclair, Keith Yordy, Steve Wolf, Phil Foster, Eric MacEachern, Dean Allen, Kent Shriver, Lawanda Thomason, Ken Aldren, and Alis Lahie.

Count VI — First Amendment violation, transfer in retaliation for filing concerns and grievances, against Tom Beauclair, Keith Yordy, Steve Wolf, Lawanda Thomason, and Henry Atencio.

Count VII — First Amendment violation, confiscating Plaintiff's legal evidence out of retaliation for filing concerns and grievances, against Tom Beauclair, Keith Yordy, Steve Wolf, Lawanda Thomason, and Henry Atencio.

## III.

## MOTIONS FOR SUMMARY JUDGMENT: MEDICAL ISSUES

### A. Standard of Law for Medical Claims of Deliberate Indifference

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In a motion for summary judgment, the moving party bears the "initial burden of identifying for the court those portions of the record which demonstrate the absence of any genuine issues of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the moving party points to portions of the record demonstrating that there appears to be no genuine issue of material fact as to claims or defenses at issue, the burden of production shifts to the non-moving party. To meet its burden of production, the non-moving party "may not rest upon the mere allegations contained in his complaint, but he must set forth, by affidavits, exhibits or otherwise, specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *see T.W. Electric Serv.*, 809 F.2d at 630 (internal citation omitted).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences that can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630–31 (internal citation omitted).

Rule 56(c) requires the Court to enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential

---

2. Sandra Dee Martin is also referred to as Sandra DeMartin, Sandi Martin, and Correctional Officer Taylor in various places in the record.

to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505.

█ To prevail on an Eighth Amendment claim regarding prison medical care, Plaintiff must show that prison officials' "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The Supreme Court has opined that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.*

> The Ninth Circuit has defined a "serious medical need" in the following ways: failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain; ... [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir.1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997).

█ Deliberate indifference exists when an official knows of and disregards a serious medical condition or when an official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and actually draws such an inference. *Farmer v. Brennan*, 511 U.S. 825, 838, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.1989). Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Lab.*, 622 F.2d 458, 460 (9th Cir.1980). A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes serious harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990).

**B. Additional Standards of Law Applicable to Iritis Claims**

Plaintiff's iritis claims are similar to the claims of recurring medical problems brought in *Sanchez v. Vild*, 891 F.2d 240 (9th Cir.1989). *Sanchez* stands for the rule that "a difference of medical opinion" regarding an inmate's treatment "does not amount to deliberate indifference to [that inmate's] serious medical needs." *Id.* at 242. *Sanchez* involved an Eighth Amendment action brought against prison medical providers "because of a recurring, chronic perirectal abscess." In about November 1986, prior to his transfer to prison, a jail doctor advised him that his condition would require surgery. On December 26, 1986, he was treated at the prison for boils on his buttocks. On January 12, 1987, Sanchez was treated for a ruptured boil. The treatment for that boil was successful, and he was free from boils until April 24, 1987. Again, the problem was resolved with treatment.

In approximately May 1987, June 1987, and August 1987, Sanchez's symptoms recurred. Each time he was treated, the symptoms abated. He was referred to two outside physicians in September 1987 for evaluation of the recurring problems. The two physicians did not recommend surgery.

The Ninth Circuit affirmed the district court's decision to grant summary judgment in favor of the medical defendants in the case, reasoning:

> The basis of Sanchez' claim is that a prison doctor, during the course of treatment, advised him that surgery was necessary. Prison officials, in their affidavits and moving papers in the district court, set forth the extensive degree to which Sanchez has received subsequent medical attention. Sanchez has seen a physician's assistant, prison doctors, and outside physicians on numerous occasions. He has received substantial treatment and medication for his ailments. The treatment has cleared up the symptoms of his ailments, which appear, however, to recur. Subsequent medical personnel have not recommended surgery.

> At most, Sanchez has raised a difference of medical opinion regarding his treatment. A difference of opinion does not amount to a deliberate indifference to Sanchez' serious medical condition.

*Id.* at 242.

In *Davalos v. Wheeler*, 2004 WL 719237 (D.Tex.2004), the court confronted an issue similar to that in Plaintiff's case. Plaintiff had been given permission by the optometrist to wear clip-on sunglasses outdoors because of light sensitivity. He filed suit because he was not allowed to wear them indoors. He rested his argument on the fact that historical medical records indicated that he could wear sunglasses indoors. However, nothing in his current medical file indicated that he had been authorized by a medical provider to wear them indoors. The Court determined that "[t]here is nothing to suggest that Plaintiff was denied any prescribed treatment." *Id.* at *4. The facts did not show that the defendants "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.*

## C. Discussion of Iritis Claims

### 1. *Iritis*

█ Plaintiff has provided the following general background information on iritis:

> Iritis is the inflammation of the iris, the colored portion of the eye. Iritis, which is often the result of a disease in another part of the body, can be a recurring condition. A fairly common eye problem, iritis usually responds well to treatment. However, the condition may become sight threatening when left untreated.... Symptoms of iritis [are] pain, tearing, light sensitivity, blurred vision, red eye, floaters, and small pupil.... The symptoms usually appear suddenly and develop rapidly over a few hours or days.... A case of iritis usually lasts six to eight weeks.... When left untreated, iritis can cause a loss of sight.

*See* Exhibit J(j) to Second Amended Complaint.[3]

---

**3.** The Court notes that, because this background information is very general and may not necessarily be applicable to Plaintiff's particular condition, Plaintiff cannot rely on it to show what particular care Plaintiff required.

### 2. History of Iritis in 1998

Plaintiff had several bouts of iritis from July 28, 1998, through October 1, 1998. He was treated by Dr. Baldeck, an ophthalmologist, who prescribed eye drops, ointment, glasses with tinted lenses, and UV-protection clip-on sunglasses for outdoor use. After some difficulty with ICI–O officials regarding the eyewear, Plaintiff was able to have his family send him the appropriate eyewear.

### 3. October 2, 1998 through May 19, 2002

Nothing in the record suggests that Plaintiff had any iritis symptoms for the next four years. On April 17, 2002, Plaintiff submitted a medical request form that stated simply, "Need refill on aspirin, getting headaches periodically throughout the day." Plaintiff made no reference that he had any eye symptoms on that date or during this entire time period.

### 4. May 20, 2002 through March 1, 2003

In 2002, Plaintiff's eyewear broke, and IDOC policy prevented him from having his family send him a replacement set. Plaintiff saw Defendant Dr. Rick Lundgren, an optometrist, on May 20, 2002. It is unclear whether Plaintiff had complained of iritis symptoms or whether he was simply attempting to obtain replacement eyewear. On that date, Dr. Lundgren found no signs of iritis in Plaintiff's eyes. Plaintiff made subjective complaints of photophobia, and so Dr. Lundgren offered to tint Plaintiff's regular glasses.

Plaintiff asked for a particular kind of sunglasses, but Dr. Lundgren said he was authorized to use only one type of prison-approved frames. Plaintiff alleges that Nurse Whipple checked with security and said that only a minimum tint for Plaintiff's regular glasses was authorized by policy. Dr. Lundgren ordered the mini-mum tint. Plaintiff received the tint on his glasses, but found that it did not help. About one month later, Debi Titus, PHS Administrator, decided that Plaintiff was authorized to have only the type of eyewear provided by Dr. Lundgren.

The record reflects no other complaints about his eyes between May 21, 2002, and March 1, 2003, a period of about nine months.

On March 1, 2003, Plaintiff submitted a medical request form that stated: "I would like to see the eye doctor. The tint in my eyeglasses are too low, and I would like to know if their U.V. protective, and I would like an eye exame" (original wording preserved). The PHS response of March 4, 2003, noted: "refer to optometry." The medical request form does not clearly show that Plaintiff was suffering from any iritis symptoms. Over the next three months, specifically from March 2, 2003, through June 12, 2003, Plaintiff made no complaints of iritis symptoms. Thus, there were no clear complaints of iritis symptoms between May 21, 2002, and June 12, 2003.

Nothing in the record reflects deliberate indifference on the part of any medical provider during this time period. Dr. Lundgren found no signs of iritis but, due to Plaintiff's subjective complaints of photophobia, authorized minimum tint lenses. There is nothing in the record to show that Plaintiff's photophobia condition *necessitated* a darker tint or sunglasses or that Lundgren was deliberately indifferent to a serious medical need by following the prison regulation. Similarly, Nurse Whipple simply relayed a message from security, which allowed Plaintiff to have a tint on his glasses. Further, Administrator Titus did not have any current medical opinion showing that Plaintiff *required* something more for his photophobia condition.

Plaintiff insists that sunglasses were required in 2002, because a doctor allowed him to have sunglasses in 1998 when he had two successive iritis bouts. However, by 2003, he had been iritis-free for nearly five years, and Dr. Lundgren found no sign of iritis in his eyes. This period of time is similar to the *Davalos* case, where the court did not allow the plaintiff to rely on past medical records, where his current medical records did not support his demand to be able to wear his sunglasses indoors. Under these circumstances, Plaintiff has not shown that the actions of Lundgren, Whipple, and Titus were the result of deliberate indifference. They are entitled to summary judgment on Plaintiff's Claim I(A), as it relates to this time period.

### 5. *June 12, 2003 through July 21, 2003*

■ On June 12, 2003, Plaintiff's eye turned red and became very painful. Plaintiff saw Dr. Hill on that date. Plaintiff complained of light sensitivity and a history of iritis. Dr. Hill did not make a diagnosis of iritis; his observation note states "conjunctiva mildly infected OS [left eye]." Dr. Hill instructed Plaintiff to use the over-the-counter eye drops available at the commissary for his eye condition.

Unaware of IDOC's policy against having medical items sent in from unauthorized sources, Dr. Hill approved an order for Plaintiff to have a pair of sunglasses sent in to him. Administrator Debi Titus told Dr. Hill that the order was contrary to IDOC policy. Dr. Hill or Administrator Titus then canceled the order. The sunglasses were sent in, and IDOC told Plaintiff to mail them out to his family.

On June 17, 2003, Dr. Hill authorized Plaintiff to use the sunglasses provided by his family by issuing them to Plaintiff through the medical department. He was unaware that this method was also contrary to IDOC policy. On June 25, 2003, Warden Phil Foster authorized confiscation of the sunglasses. Plaintiff filed a concern form with Foster, informing him that the medical department had issued the sunglasses and asserting that not having the sunglasses could cause serious risk to his eyesight.

On June 30, 2004, Defendant Kent Shriver answered the concern, noting that Foster could override medical decisions; he attached a memo from Debi Titus showing that glasses and other items could not be sent into the institution from family members, but that state prescribed glasses could be issued if the optometrist found it medically necessary. On July 3, 2003 Defendant Thomason denied Plaintiff's grievance regarding the medical need for protective eyewear, stating, "You cannot have personal glasses sent in. If medical prescribes it, they purchase and issue it." Defendant Allen reviewed and affirmed the grievance, stating, "if medical desired an exception to the policy, it would contact IDOC and seek that permission."

On July 21, 2003, Plaintiff had a second visit with Dr. Lundgren, the optometrist. Dr. Lundgren found no sign of iritis, but offered to put a UV protective coating on Plaintiff's glasses, but Plaintiff refused it. Also on that date, Plaintiff complained in writing to IDOC, and IDOC offered to put a darker tint and UV coating on his glasses. Plaintiff refused.

■ The Court now considers the issue of whether Dr. Hill, Administrator Titus, and Dr. Lundgren were deliberately indifferent during this time period. Plaintiff argues that Dr. Hill was deliberately indifferent because he did not do *more* for his eye condition. However, Dr. Hill did not ignore Plaintiff's condition—he told him to use the eye drops available at the commissary because the eye condition had not

progressed very far. In addition, Dr. Hill tried to find a quick and acceptable way to allow Plaintiff to use the sunglasses his family had sent him by issuing them through the medical department so that he could wear them. Unfortunately, his attempts were contrary to IDOC security policy. Dr. Hill had nothing to do with the confiscation of Plaintiff's glasses by IDOC officials after he issued the glasses through the medical department.[4] Further, Plaintiff did not have iritis symptoms upon seeing Dr. Lundgren on July 21, 2003. In any event, differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *See Sanchez v. Vild*, 891 F.2d at 242.

Titus's memorandum makes it clear that Plaintiff *could* have a pair of authorized glasses if deemed a medical necessity by the optometrist, but that it needed to be obtained and issued by the medical department, not sent in from a family member. There is no indication in the memorandum or any other correspondence in the record that Titus intended to deprive Plaintiff of something that was medically necessary. She simply wanted him to follow the rules. Dr. Hill, because he was unaware, had not followed the rules in issuing Plaintiff the sunglasses sent in by Plaintiff's family.

Similarly, Warden Foster offered to accommodate Plaintiff:

> You will be provided glasses by medical. You can't have personal glasses sent in. If you need consideration while waiting for the medically issued glasses let them or myself know.

*See* Exhibit A to Second Amended Complaint. It is unclear whether Plaintiff ever responded to Foster's offer of an accommodation.

Clearly, Dr. Lundgren was unsure of the security policy. Security has been held to be a legitimate penological reason for denying inmates sunglasses. *See Pina v. Gomez*, 1999 WL 13708 (N.D.Cal.1999) (affirming denial of sunglasses under a policy more restrictive than IDOC policy). Nurse Whipple had sought out the security policy on behalf of Dr. Lundgren and had been told that only a minimum tint was allowed. There is no indication that Dr. Lundgren's decision to prescribe the minimum tint was done with deliberate indifference to Plaintiff's eye condition, rather than in deference to the security policy, the terms of which he was unaware. There is also no indication that Dr. Lundgren deemed sunglasses a medical necessity; rather, it appears that he was trying to appease Plaintiff's subjective complaint of photophobia. There was no diagnosis of iritis in the medical records.

A common thread in the correspondence of Debi Titus and the other IDOC Defendants is that each told Plaintiff of a reasonable alternative to resolve his medical problem *in adherence to* the policy. If anything, the evidence indicates that "there was some confusion [among medical personnel and security officers] regarding ... the policy on sunglasses; however, such confusion does not amount to deliberate indifference." *Id.* at *3. Summary judgment is appropriate for Defendants Hill, Titus, and Lundgren on Claim I(A) during this time period.

6. *July 28, 2003 to November 27, 2003*

██ On July 28, 2003, approximately three days after Plaintiff had first made allegations of sexual harassment by Defendant Officer Sandra Dee Martin, prison

---

4. The Court notes that Defendants Foster, Shriver, Thomason, and Allen are not seeking summary judgment regarding these claims at this time.

officials decided to transfer Plaintiff to ISCI in Boise. They assert the move was for his own safety. On or near that date, medical personnel at ICI–O prepared an intrasystem transfer form, which noted Plaintiff's medical history. The history indicates "iritis" in the "significant medical history" category and "positive Hepatitis C" in the "chronic clinics" category.

On July 29, 2003, Plaintiff's transfer to ISCI in Boise was completed. On July 30, 2003, Plaintiff was screened by the medical department at ISCI. The intrasystem transfer form was marked with a diagonal line through all categories; it is unknown whether that meant he had no current complaints or whether he was not screened. The form did note that he would be referred to the chronic care clinic for Hepatitis C.

On August 2, 2003, Plaintiff complained that he needed sunglasses to go outside, his left eye was getting worse, and he was still in pain. On August 4, 2003, a note from Secretary C. Malone on the health services request co-pay form states "no show," that a referral to optometry should be made, that an optometrist must prescribe sunglasses, and that optometry appointments were six weeks out.

The Court will now consider Plaintiff's claim that Dr. Antonie was deliberately indifferent for allowing such a long time period to elapse between his request for optometry services on August 2, 2003, and the actual visit on December 8, 2003. Nothing in the record shows that the delay between August and December was caused by Dr. Antonie. The fact that Dr. Antonie was the contracted optometrist at the prison does not mean that he personally accepted medical request forms or scheduled appointments. Dr. Antonie's responses to interrogatories show that he did not have anything to do with scheduling appointments, but that PHS had complete respon-sibility for scheduling. The PHS notation shows that optometrist appointments were "six weeks out." There are no facts in the record to show that Dr. Antonie knew of Plaintiff's request for treatment prior to the date of Plaintiff's appointment; therefore, Plaintiff's allegation that Dr. Antonie should have reviewed Plaintiff's medical records and scheduled him for an earlier appointment is unsupported. In summary, Plaintiff has no facts to support his claim that Dr. Antonie participated in the delay of Plaintiff's treatment. There is nothing in the record to suggest that Dr. Antonie was deliberately indifferent to Plaintiff. Therefore, he is entitled to summary judgment for this time period.

Returning to the chronology of events relating to Plaintiff's eye care after August 2003, the Court notes that Plaintiff asserts that, on September 8, 2003 and September 16, 2003, he informed Dr. Baillie he had requested a visit with the optometrist, and had not yet been scheduled. Plaintiff asserts that Dr. Baillie told him that he would refer Plaintiff to the optometrist. Dr. Baillie did not enter any notes in the medical records about Plaintiff's request for eye care.

On October 1, 2003, Plaintiff complained of constant eye pain and a recurrent history of iritis. Dr. Baillie noted that there were no previous requests for evaluation of this problem in the medical records. Dr. Baillie requested medical records from ICI–O and again stated that he would refer Plaintiff to an optometrist.

There is nothing further in the record showing that Plaintiff complained of iritis problems between October 2, 2003, and November 27, 2003. It is also unclear whether PHS staff did anything regarding a reference to an optometrist between its response to Plaintiff on August 4, 2003, and November 27, 2003.

■ PHS has correctly pointed out that there is no respondeat superior liability in § 1983 actions. However, Plaintiff has come forward with sufficient evidence to raise a genuine issue of material fact as to PHS's patterns and policies. Plaintiff may proceed on his claims that PHS was deliberately indifferent to Plaintiff's eye condition because its policies caused PHS employees to (1) improperly screen his eye condition;[5] (2) fail to schedule Plaintiff for an eye appointment between August and December 8, 2003; or (3) refuse to schedule Plaintiff with an optometrist sooner than a date "six weeks out" if he appeared to need immediate care. As a result, PHS's summary judgment motion is denied for claims related to this time period.

### 7. November 28, 2003, to December 28, 2003

On November 28, 2003, Plaintiff requested medical attention for left eye pain that had started the previous night. His health services request form noted a history of left eye problems. He saw the physician's assistant that same day, was given an eye patch and Ibuprofen, and was issued a memo to have his meals on his tier.

On November 29, 2003, a physician's assistant saw Plaintiff. He appeared to be very photophobic. A prescription for Darvocet was given. The PA questioned whether the symptoms were from iritis or had another etiology. On December 1, 2003, Plaintiff was seen again by PHS. The Darvocet was continued and a note was made to refer him to an ophthalmologist regarding iritis. On December 4, 2003, a referral form was completed for Plaintiff to see an ophthalmologist, Dr. Sonntag, for "chronic iritis" that "waxes and wanes." Plaintiff has submitted affidavits of other

inmates showing that they observed Plaintiff having problems with his eyes on November 28, 2003, and that the eye problems continued into December 2003.

On December 8, and 15, 2003, Plaintiff saw the optometrist, Dr. Antonie. He gave Plaintiff a different type of eye drops and planned to refer Plaintiff to an ophthalmologist to rule out iritis or another condition and to determine etiology. Dr. Antonie did not give Plaintiff a full eye examination to determine his prescription because PHS policy allowed regular eye exams only every two years, and Plaintiff's last exam was too recent to repeat.

On December 22, 2003, Plaintiff saw Dr. Gary Pabalis, an ophthalmologist associated with Dr. Sonntag's office. He gave Plaintiff two prescriptions for left eye iritis and recommended sunglasses.

■ The Court now considers whether Plaintiff has asserted any facts showing that Dr. Antonie was deliberately indifferent during this time period. Plaintiff asserts that his eye condition required prescription sunglasses and tinted lenses on his regular glasses. Dr. Antonie gave Plaintiff a different type of eye drops and referred him to an ophthalmologist. Dr. Antonie also noted that PHS was already providing care for Plaintiff's iritis. Dr. Antonie opined, after examination and a review of the medical records, that Plaintiff did not need *additional care* beyond that provided by PHS and that Plaintiff did not need sunglasses. Plaintiff's allegations amount only to a difference of opinion as to the treatment provided by Dr. Antonie. It is clear that Dr. Antonie provided eye treatment as he deemed appropriate, which cannot be regarded as deliberate indifference.

---

**5.** Whether he was screened upon his arrival at ISCI is unknown from the record and may be subject to summary judgment at a later date if there is evidence that screening took place and his eyes were clear.

■ Plaintiff also asserts that Dr. Antonie violated his rights by not providing a full eye examination on December 8. However, Dr. Antonie refused to provide such an examination because (1) as a prisoner, Plaintiff was entitled to only one exam every two years, and he had already had that exam, and (2) Dr. Antonie did not see anything in his examination of Plaintiff that caused him to believe that a full eye examination was *medically necessary at that time.* Plaintiff has not shown that a "full eye examination" was required to treat his condition. Plaintiff was already receiving treatment for iritis from PHS, and Dr. Antonie referred him to an ophthalmologist. For all of these reasons, he has failed to show that Dr. Antonie was deliberately indifferent to his eye condition. Accordingly Dr. Antonie's Motion for Summary Judgment shall be granted.

■ The Court also considers whether PHS was deliberately indifferent during this time period. PHS provided treatment to Plaintiff on the same day he complained of severe eye pain and scheduled follow-up treatment with appropriate specialists. During the time period he was waiting to see the optometrist and ophthalmologist, PHS continued to provide care, though perhaps not the type or extent of care Plaintiff desired. The only questions for this time period is whether PHS was deliberately indifferent for delaying his visits to the eye specialists and whether the delay caused Plaintiff any harm. Because Plaintiff has failed to show harm and a causal link between this time period and any alleged harm, the Court will grant summary judgment. However, Plaintiff may file a motion to reconsider if he is able to obtain an expert opinion regarding harm and a causal link.

8. *December 29, 2003, to May 16, 2004*

■ On December 29, 2003, Dr. Baillie ordered Plaintiff a pair of sunglasses, as Dr. Pabalis had prescribed, and again referred Plaintiff to an ophthalmologist for chronic iritis with frequent flare-ups. On January 6, 2004, Plaintiff was examined by Dr. Sonntag. Dr. Sonntag determined that Plaintiff's iritis was mostly resolved, and therefore that he did not have a medical need for sunglasses. On that date, his vision was 20/40 in each eye. On January 8, 2004, Plaintiff saw Defendant McCready, who said that Plaintiff was finished with his treatment. As a result of Dr. Sonntag's determination that there was no medical necessity for sunglasses, PHS did not finalize the order for Plaintiff's sunglasses.

Plaintiff cites to discrepancies between Dr. Sonntag's Affidavit (Docket No. 25) and a conversation Plaintiff had with Dr. Sonntag after the Affidavit had been signed. Plaintiff argues that, because of these discrepancies, Dr. Sonntag's Affidavit and his Supplemental Affidavit (Docket No. 50) should be disregarded. However, Plaintiff has also submitted the consultation follow-up letter written by Dr. Sonntag to Dr. Baillie, which predates all of the Affidavits, is consistent with the Affidavits, and clarifies his findings and Plaintiff's treatment.

In summary, Dr. Baillie ordered sunglasses on December 29, 2004, pursuant to Dr. Pabalis's prescription of December 22, 2004. Dr. Pabalis had seen Plaintiff on behalf of Dr. Sonntag in Dr. Sonntag's office. However, in the follow-up visit, on January 6, 2005, Dr. Sonntag determined that sunglasses were no longer necessary because the iritis had cleared. As a result, PHS did not order sunglasses for Plaintiff.

The record does not reflect any symptoms of iritis from January 6, 2004, until May 17, 2004, a period of approximately six months. On January 26, 2004, Plaintiff submitted a concern form that referred to

his treatment for iritis in the past tense and that demanded compensation, which implies that his symptoms had subsided.

Based upon all of the foregoing, the Court concludes that Plaintiff has not shown that PHS was deliberately indifferent to Plaintiff's eye condition by failing to fill the order for sunglasses between December 22, 2003, and January 6, 2004, when his eye condition cleared up. Plaintiff's vision appeared normal and he showed no signs of iritis for the next six months, and, therefore, he has not shown that the delay of 15 days caused any harm. PHS is entitled to summary judgment on Claim I(A) for this time period.

9. *May 17, 2004 to July 14, 2004*

 On May 17, 2004, Plaintiff submitted a medical request to see the optometrist because he was having more eye problems and pain. On June 7, 2004, Plaintiff submitted a concern stating he had not yet been seen. On June 23, 2004, Plaintiff told Dr. Baillie he wanted to have an eye examination for blurred vision, headaches, and photophobia. Dr. Baillie authorized a visit to Dr. Sonntag, an ophthalmologist. On June 29, 2004, Plaintiff was scheduled for an appointment with Dr. Sonntag for July 12, 2004. On July 14 or 15, 2004, Dr. Sonntag examined Plaintiff, determined that his iritis was resolved, and prescribed no follow-up treatment.

Plaintiff had to wait for an ophthalmologist visit for approximately 60 days. It is unclear whether he continued to suffer blurred vision, headaches, and photophobia during this time period, or whether he used over-the-counter treatment to adequately relieve his symptoms, especially given the fact that his iritis was deemed resolved by the date of the appointment. The record, construed in a light most favorable to Plaintiff, is sufficient to support an inference that PHS was deliberately indifferent to Plaintiff's eye condition during this time period. Summary judgment is denied without prejudice on Claim I(A) for this time period and a second motion may be brought at a later date.

10. *July 15, 2004 to November 30, 2004*

The record does not reflect any symptoms of iritis during this time period of nearly five months.

11. *December 7, 2004 to March 2005*

On December 7, 2004, Plaintiff was examined by Dr. David Tomey, apparently a medical doctor at the prison, for iritis symptoms. He prescribed Vicoden and Prednisone for iritis and referred Plaintiff to an ophthalmologist. On December 21, 2004, Dr. Haggard, a medical doctor and PHS administrator in charge of specialist referrals, agreed with Dr. Tomey and referred Plaintiff to an ophthalmologist, and agreed to send him to someone other than Dr. Sonntag, because of Dr. Sonntag's involvement in this litigation. On December 30, 2004, PHS scheduled Plaintiff scheduled for an ophthalmology appointment for January 25, 2005.

On January 14, 2005, Plaintiff complained of pain. On January 24, 2005, Plaintiff complained of headaches. On January 25, 2005, IDOC cancelled Plaintiff's ophthalmology appointment because his tier was not cleared after inmate count. Also on January 25, 2005, Plaintiff saw Dr. Tomey at the prison, who provided further treatment for Plaintiff's eye. On February 8, 2005, Plaintiff saw Dr. Lawrence Anderson, an ophthalmologist. Dr. Anderson prescribed eye drops, tinted indoor lenses for regular glasses, and prescription sunglasses. As of March 25, 2005, Plaintiff had not received the sunglasses.

The Court now considers whether PHS is entitled to summary judgment for this time period. During the time period he was waiting to see the optometrist and ophthalmologist, PHS continued to provide care, though perhaps not the type or extent of care Plaintiff desired. PHS may have been deliberately indifferent for delaying his visits to the eye specialists; however, Plaintiff has failed to show harm and a causal link between this time period and any alleged harm. As a result, the Court will grant summary judgment. However, Plaintiff may file a motion to reconsider if he is able to obtain an expert opinion regarding harm and a causal link.

Because it is unclear whether Plaintiff has received the glasses and sunglasses prescribed by Dr. Anderson, the Court will deny PHS's Motion for Summary Judgment on the issue of whether it was deliberately indifferent to Plaintiff's eye condition after February 8, 2005, for failing to order the glasses and sunglasses prescribed by Dr. Anderson.

### 12. *Overall Time Period*

As the Court reviews the overall time period during which Plaintiff complains of recurring symptoms, the Court notes that Plaintiff has failed to provide an expert opinion showing that there was any harm, permanent or otherwise, caused by multiple delays in providing care for Plaintiff's recurring condition. The Court will grant summary judgment on this claim, but will allow Plaintiff to file a motion for reconsideration if he is able to bring forward an expert opinion on harm and causation. *See* Fed.R.Civ.P. 60(b)(2). Because PHS has not provided Plaintiff with copies of his 2005 records from Dr. Anderson, the Court will consider such, and any further expert opinions based upon his records, "newly discovered evidence which by due diligence could not have been discovered in

time" for consideration of the current Motions. *See id.*

### D. Discussion of Hepatitis A and B Vaccination Claims

In Count I(B), Plaintiff alleges that Defendants Phil Foster, Eric MacEachern, Dan Allen, Kent Shriver, Lawanda Thomason, Ken Aldren, Alis Lahie, Sandra Dee Martin, Debi Titus, Dr. Hill, Dr. Lundgren, Dr. Antonie, Susan Whipple, and PHS, Inc., violated his Eighth Amendment rights by being deliberately indifferent to Plaintiff's serious medical need for Hepatitis A and B vaccinations.

Plaintiff has Hepatitis C. While an inmate at ICI–O, he was scheduled to receive the Hepatitis A and B vaccinations. He alleges that if he is infected by either disease, there is a high probability of death. He alleges that Defendants placed him at a higher risk of serious harm by delaying and interfering with this treatment because they transferred him to ISCI, an institution with an inmate population of about 1200, as opposed to ICI–O, which has an inmate population of about 480.

Plaintiff was transferred on July 29, 2003. On September 8, 2003, he was seen in the chronic care clinic by Dr. Baillie, who ordered the Hepatitis B vaccination for Plaintiff. The Hepatitis A and B vaccines are given in a series. On March 9, 2004, Plaintiff received his first Hepatitis B shot. On June 11, 2004, Plaintiff received his second Hepatitis B and his first Hepatitis A shot. On July 1, 2004, Plaintiff received his third Hepatitis B and his second Hepatitis A shot. On January 24, 2005, Plaintiff received his fourth Hepatitis B and third Hepatitis A shot, finishing the series.

Plaintiff's claim fails upon these facts because he cannot show that any harm occurred. A mere delay in

treatment does not constitute a violation of the Eighth Amendment unless the delay causes serious harm. *Wood v. Housewright,* 900 F.2d 1332, 1335 (9th Cir.1990). In this case, Plaintiff did not contract Hepatitis A or B during the time period before he received his vaccinations. Plaintiff alleges that he suffered from worry and distress during this time period. However, an inmate may not pursue an emotional distress injury unless accompanied by a physical injury. See Title 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility for mental or emotional injury suffered while in custody without a prior showing of physical injury."). For all of the foregoing reasons, all Defendants are entitled to summary judgment on Claim I(B).

## IV.

### APPOINTMENT OF COUNSEL FOR PLAINTIFF

■■■■ Whether a court appoints counsel for indigent litigants is within the court's discretion. *Wilborn v. Escalderon,* 789 F.2d 1328, 1330–31 (9th Cir.1986). In civil cases, counsel should be appointed only in "extraordinary cases." *Id.* at 1330. To determine whether extraordinary circumstances exist, the court should evaluate two factors: (1) the likelihood of success on the merits of the case, and (2) the ability of the plaintiff to articulate his claims pro se in light of the complexity of legal issues involved. *Terrell v. Brewer,* 935 F.2d 1015, 1017 (9th Cir.1991). Neither factor is dispositive, and both must be evaluated together. *Id.*

■■■ It appears that Plaintiff has a likelihood of success on some of his claims. In addition, the sensitive nature of the sexual abuse claims make appointment of counsel appropriate. Based on the foregoing rea-

sons, the Court finds it appropriate to grant Plaintiff's request for appointment of counsel. The Court shall appoint counsel for Plaintiff from its Pro Bono Panel by separate order. Plaintiff shall not file anything further pro se in this case, but shall file everything through counsel.

## V.

### ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Defendant Lundgren's Motion for Summary Judgment (Docket No. 56) is GRANTED.

IT IS FURTHER HEREBY ORDERED that Defendant Antonie's Motion for Summary Judgment (Docket No. 91) is GRANTED.

IT IS FURTHER HEREBY ORDERED that IDOC Defendants' Motion for Summary Judgment (Docket No. 96) is GRANTED in part as to Plaintiff's claim I(B) (Hepatitis vaccinations); the remainder is DENIED without prejudice. The remainder of the Motion can be reasserted by notice after Plaintiff's counsel has had an opportunity to conduct discovery.

IT IS FURTHER HEREBY ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 99) is DENIED without prejudice. If Plaintiff's counsel wishes to renew this Motion, he or she can. However, at this point, it appears unnecessary.

IT IS FURTHER HEREBY ORDERED that, as to PHS Defendants' Motion for Summary Judgment (Docket No. 126):

A. Summary judgment for Susan Whipple is GRANTED;

B. Summary judgment for Dr. Hill is GRANTED;

C. Summary judgment for Debi Titus is GRANTED;

D. Summary judgment for PHS, Inc., is GRANTED as to Claim I(B);

E. Summary judgment for PHS, Inc., is GRANTED as to Claim I(A) for all time periods except those specified immediately below;

F. Summary judgment for PHS, Inc., is DENIED as to Claim I(A) for the time periods (1) between August 2, 2003, to November 27, 2003; (2) the time period between May 17, 2004, and July 14, 2004 (denied without prejudice); and (3) the time period after February 8, 2005, for allegations that PHS failed to order the glasses and sunglasses prescribed by Dr. Anderson.

IT IS FURTHER HEREBY ORDERED that all claims against Defendant Dr. Baillie and Defendant McCready are dismissed based upon Plaintiff's request for voluntarily dismissal.

IT IS FURTHER HEREBY ORDERED that Defendants' Motion to Strike Declarations (Docket No. 114) is GRANTED. Docket Nos. 107, 108, and 109 are DEEMED STRICKEN.

IT IS FURTHER HEREBY ORDERED that Plaintiff's Motion for 56(f) Postponement (Docket No. 133) is DENIED. However, after Plaintiff obtains the records of Dr. Anderson, Plaintiff's counsel may request reconsideration of any decision herein, if warranted. Plaintiff is cautioned that he will need an expert medical opinion to show harm, he will also need to establish a causal link between a previous medical provider's care and any damage present in his current eye condition by expert opinion, and he will need to show deliberate indifference as opposed to the torts of negligence or medical malpractice, which are not before the Court.

IT IS FURTHER HEREBY ORDERED that Plaintiff's Motion to Compel (Docket No. 136) is DENIED. The Court shall appoint counsel for Plaintiff. Counsel may proceed with full discovery on any claims which will not be the subject of a qualified immunity motion, and limited discovery on any claims which may be the subject of a qualified immunity motion. As to Plaintiff's retaliation claims, the question before the Court shall be limited to whether, under *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the [defendant's] conduct violated a constitutional right," because the right to be free from retaliation was clear at the time of the alleged violations. *See Bruce v. Ylst*, 351 F.3d 1283 (9th Cir.2003).

IT IS FURTHER HEREBY ORDERED that Plaintiff's Motion for a Protective Order (Docket No. 135) is deemed MOOT, given appointment of counsel for Plaintiff in this case. Counsel for IDOC and counsel for Plaintiff shall be required to consult on the subject matter of the motion and determine the proper manner for treatment of Plaintiff's witnesses by IDOC employees.

IT IS FURTHER HEREBY ORDERED that the parties may continue to conduct discovery through **July 29, 2005.** (Plaintiff shall not conduct discovery on his own, but shall wait for counsel to do so on his behalf.) The parties may renew or submit a second round of summary judgment motions and submit motions for reconsideration no later than **September 16, 2005.** Responses shall be due no later than **October 17, 2005.** Replies shall be due no later than **November 1, 2005.**

IT IS FURTHER HEREBY ORDERED that counsel for the parties shall contact the Court's ADR Director, Denise Asper, Esq., to determine an appropriate

date for a mediation or judicial settlement conference in this case.